### CROWE v. OSCAR BARNETT FOUNDRY CO.

(District Court, D. New Jersey.  May 8, 1914.)

1. PATENTS (§ 214*)—EXCLUSIVE LICENSE—RESCISSION—EQUITABLE RELIEF.
    Where complainant granted defendant an exclusive license to manu-
    facture and sell a patented grate bar and stoker, to continue during the
    life of the patent, on a royalty of one cent a pound for metal used in
    stokers sold, defendant agreeing to manufacture the stokers and to pay
    royalties under the contract on specified quarterly dates during the life
    of the patent, and on patents on all improvements covering metal for
    stokers and operating equipment, except engines, etc., the fact that com-
    plainant committed a breach of the contract by accepting a personal con-
    tract to install one of the stokers for a customer did not authorize de-
    fendant to refuse further to manufacture and sell stokers pursuant to the
    license; and, having done so, complainant, being only entitled to recover
    royalties on stokers manufactured and installed pursuant to the license,
    had no adequate remedy at law, and was therefore entitled to a rescis-
    sion of the contract in equity.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 321–327; Dec.
    Dig. § 214.*]

2. CONTRACTS (§ 262*)—RESCISSION—DEFENSES.
    In a suit in equity to rescind a contract, the fact that there has been
    a breach on both sides does not preclude the granting of such relief.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1181–1183;
    Dec. Dig. § 262.*]

In Equity.  Suit by Paul L. Crowe against the Oscar Barnett Found-
ry Company.  Decree for complainant.

W. P. Preble, of New York City, for complainant.
Russell M. Everett, of Newark, N. J., for defendant.

BRADFORD, District Judge.  [1] This is a bill for the rescission
of a contract between the complainant, Paul L. Crowe, and the Oscar
Barnett Foundry Company, hereinafter referred to as the foundry
company, and for an account of profits made by the latter.  On care-
ful consideration I have reached the conclusion that under the special
circumstances of this case there should be a decree for the rescission
of the contract, but not for an accounting on either side; and further,
that in view of the fact that both parties have been at fault the total
costs and expenses of the suit should be paid equally by them.  Crowe
being the inventor and owner of certain improvements in mechanical
stokers for the smokeless burning of bituminous and anthracite coal
for use in connection with steam boilers and furnaces, and the
foundry company being desirous of manufacturing stokers con-
taining such improvements, entered, Crowe as party of the first part,
and the foundry company as party of the second part, into a contract
under seal bearing date January 29, 1908, whereby, for the consid-
erations and covenants therein set forth Crowe granted to the foundry
company, among other things, a sole and exclusive license to manu-
facture and sell chain grate mechanical stokers under United States
patents to be granted to him under three certain applications by him
then pending in the United States patent office; such sole and ex-

clusive license to continue "for the life of all patents issued upon said applications." Crowe further granted to the foundry company a license to manufacture and sell the grate bar designed for stokers under patent No. 866,627 in a large number of states, including, among others, New Jersey, for the life of the patent, upon a royalty of one cent for every pound of metal used in the stoker and its operating equipment, excepting the engine. Crowe also granted a license to the foundry company (exclusive as to some territory and non-exclusive as to other territory), to manufacture and sell chain grate stokers covered by the above mentioned patent as to grate bar and by claims in the above mentioned applications for patents, and also all applications made by him for improvements thereon, the license not to be exclusive in the states and territories other than those specified in the contract, upon a like royalty of one cent per pound of metal used in the stoker and operating equipment, excepting the engine. Crowe further granted to the foundry company a license to manufacture and sell the said chain grate stoker with all improvements thereon which should be made by Crowe for "the life of all patents issued upon any and all applications hereinafter made by said party of the first part on said stoker upon the same terms as above set forth for the above mentioned states and territories." The foundry company in and by the contract expressly undertook the manufacture of the stokers under the protection of the above mentioned applications, patent and improvements, and "guarantees absolutely to the party of the first part the payment to him as a license fee" of the above mentioned royalty and "agrees absolutely to make settlements to be delivered on the tenth days of January, April, July and October, in each year for the life of the above patent, and of the patents issued upon the said applications, and upon all improvements covering all metal for stokers and operating equipment, except engine, shipped from its shop or other place from which it is made or procured by said party of the second part during the period of the last preceding three months." The foundry company agreed to keep separate order and invoice books for the record of the sale of the said stokers and granted the right to Crowe "to inspect at any time said books." The foundry company agreed "to make and deliver to the said party of the first part full and true returns, under oath, of all stokers and parts thereof, including repair parts shipped by it, together with operating equipments, except engine, and of the total weight of metal used therein, the names of the parties and localities for which said stokers and said parts are to be installed or used on or before the tenth days of January, April, July and October in each year covering a period of the previous three months, for the life of the said patents and improvements." Crowe agreed to protect the foundry company "in the rights herein granted against any infringement on the claims in the patent already issued, and on patents which may be hereafter issued * * * on said applications and improvements," and agreed that all improvements made by him on the stoker should be used on the stokers manufactured by the foundry company. And it was further agreed that if such improvements should be of such value that they should be protected

213 F.—55

by patent, the foundry company would take out such patents at its own expense. On the execution of the above contract Crowe entered into the employ of the foundry company to show it how to construct the stokers and to make the installations, and remained in such employ until August, 1909; but his connection with the foundry company did not long continue before dissatisfaction or differences arose between them. Crowe testifies, among other things, to the effect that while he was in its employ the foundry company was "very arbitrary in building the stoker properly, and when I was at the plants to make the installations the work was so poor that I had to build the stokers over at the plant, which cost a great deal of time and money," and that about the first of August, 1909, he left the employ of the foundry company and took an order from the Commercial Trust Company in Jersey City for the construction of a stoker on his own account and for his own benefit "under my former patent." This action on the part of Crowe led to litigation between the parties. The foundry company brought two suits in the court of chancery of New Jersey against Crowe, alleging violation of the contract on his part, the first being instituted August 31, 1909; and the decisions in both of these suits were adverse to Crowe, and were affirmed on appeal. In them it was decided that Crowe had violated the rights of the foundry company under the exclusive license granted to it in and by the contract of January 29, 1908, and he was compelled to pay damages. Untenable and unjustifiable as the conduct and position of Crowe subsequently may have been, there is enough in that contract to indicate that he may have taken only a mistaken view of the right to construct and install the stoker for the Commercial Trust Company. The contract provided that Crowe should protect the foundry company "in the rights herein granted against any infringement on the claims in the patent already issued, and on patents which may be hereafter issued by the United States patent office on said applications and improvements." The evidence is that Crowe was at and prior to the execution of the contract the owner of many patents not referred to in that contract, relating to improvements in mechanical stokers for the smokeless burning of bituminous and anthracite coal for use in connection with boilers and furnaces. It appears from the testimony of Hanney, the secretary and treasurer of the foundry company, that knowledge of the fact that Crowe had taken the order for the installation of the stoker for the Commercial Trust Company "came to us from Mr. Crowe himself. He asked us to manufacture certain parts of the stoker, and we refused to do so, claiming that our contract entitled us to have the order turned over to us." This incident certainly does not indicate a fraudulent intent on the part of Crowe to invade the exclusive rights of the foundry company. But whether Crowe's intent in doing what has been conclusively decided to constitute a breach of contract and of the rights of the foundry company under the exclusive license granted to it, was innocent, though mistaken, on the one hand, or, on the other, wrongful, is a question not necessarily decisive of this case upon the facts disclosed. After Crowe left the employ of the foundry company in August, 1909, it continued to pay him the royalty provided for in the contract until January, 1912, when

it ceased such payment and has never resumed it; the total amount of royalties paid by it to Crowe amounting to about $9,000. The evidence is that up to that time the foundry company continued the manufacture and sale of stokers under the contract. Since January, 1912, the foundry company never made any return to Crowe of stokers and parts thereof made or installed by it, and since that date it made and installed from fifty to seventy-five chain grate mechanical stokers. Hanney testifies touching the operations of the foundry company with respect to the contract since January, 1912, as follows:

"Q. You don't, of course, deny that you stopped working under it? A. Yes, I do deny it. Q. You deny now that the company stopped work under it? A. Yes. Q. What did their working under consist of subsequent to January 10, 1912? A. Consisted largely of paying royalties. Q. Since January 1, 1912? A. Since then? I don't know whether we were working under it or not since January, 1912. * * * Q. On direct examination you were asked why the defendant company ceased paying royalties on January 1, 1912. You remember that? A. Yes. Q. Do you remember what you answered to that question? A. Yes. Q. Why we [you] ceased to pay royalties? A. Yes. Q. Why? A. On account of Mr. Crowe failing to keep his contract to protect us against infringers and going out and infringing himself. Q. That is the only reason you care to state? A. No, that is one what we consider good reason. Q. And you had no others to state, that is you didn't care to state? A. I have none to state at this minute."

It thus appears from the evidence that the foundry company after ceasing to pay royalties to Crowe under the contract from and after January, 1912, manufactured and installed from fifty to seventy-five chain grate mechanical stokers and paid royalties thereon, the secretary and treasurer of the company stating that the work of the foundry company subsequent to January 10, 1912, "consisted largely of paying royalties." No royalty after January, 1912, was paid to Crowe. If the foundry company was operating under the contract in manufacturing and installing chain grate mechanical stokers the royalty was due and should have been paid to Crowe, unless the company was relieved from so doing by a judicial determination. The fact that no royalty was paid to Crowe after January, 1912, although the above mentioned large number of stokers were made and installed, affords potent evidence that the foundry company in making and installing stokers after that date was not working under the contract. It appears that the foundry company paid royalties; but to whom? They were not paid to Crowe who was entitled to receive them if it was working under the contract. Yet the royalties were paid and could not have been paid to any other person than Crowe under the contract. There is only one reasonable inference to be drawn from the facts, namely, that the company while holding an exclusive license from Crowe under the contract to manufacture and install stokers, was not operating under the contract, but independently of the license. This inference is fully supported beyond the possibility of successful contradiction by a statement by the foundry company in section 4 of the answer, that it denies that since January 10, 1912, "it has made and sold chain grate mechanical stokers in all essential particulars practically identical with those upon which it had paid royalty previous to that date, and denies that it has ever failed to

pay full royalty upon all chain grate mechanical stokers made under said contract." It thus appears from the answer which is binding upon the foundry company that it never failed to pay full royalty upon all stokers made under the contract, but that since January, 1912, the stokers made and sold by it were not identical in essential particulars with those covered by the contract. Hanney testifies to the effect that he believed that the foundry company owned a patent taken out by one Clark on a grate bar shoe for stokers, and that the foundry company was using that patent in the manufacture of stokers. The inevitable conclusion is that the stokers manufactured and sold by the foundry company after January, 1912, were different from those called for by the contract upon which alone royalty could become payable to Crowe. By the contract Crowe granted, among other things, to the foundry company a sole and exclusive license (except as in the contract otherwise provided) to manufacture and sell the stokers therein referred to, and the foundry company in consideration of this grant, bound itself to enter upon the manufacture of such stokers and to pay to Crowe the royalty mentioned in said contract. The contract was of a continuing nature; the license to last during the life of the patents with respect to which it was granted. The foundry company, whatever may have been the dereliction of Crowe in the violation of the rights he granted to it, has placed itself in a more reprehensible position. The only royalties which could be paid by the foundry company to Crowe would necessarily be the product of the manufacture and sale by that company of stokers under the contract with Crowe, and when the foundry company, holding this exclusive license, abandoned the manufacture of stokers under the contract, it destroyed the only source from which Crowe could receive the stipulated consideration for the exclusive rights granted by him to that company. So long as the foundry company omits to manufacture the stokers under the contract a recovery of royalties by Crowe is impossible. The company has put itself in the position of advancing its own interests by disregarding its undertaking to manufacture stokers from which Crowe could derive a royalty; by manufacturing stokers independently of its licensed right under the contract; and by preventing Crowe from competing with it by holding him to the exclusive license originally granted by him. This action on the part of the foundry company creates, in my opinion, an unjust and intolerable condition which should not be permitted to continue. As before said, Crowe certainly could not recover royalties for the manufacture of stokers outside of the contract. And owing to the continuing nature of the contract an action at law for damages for its violation by the foundry company could not afford an adequate remedy. It is true that there has been fault on both sides, but the injustice and oppression now indulged in by the foundry company against Crowe are so glaring as to require an absolute determination of the existing condition of things. While the foundry company denies that it has repudiated or abandoned the contract of January 29, 1908, its acts and conduct above referred to belie its words and disclose a clear abandonment and repudiation of that contract save in so far as it seeks to use it for a wrongful and practically fraudulent purpose. Under such

circumstances it is incumbent on a court of equity to declare and decree a rescission.

The contract of January 29, 1908, is continuing in its nature, but contains no provision for its rescission for any default or defaults on the part of either or both of the parties in the performance or observance of its stipulations or provisions. It does not follow from the absence of a provision for rescission that none can be effected. A continuing contract requiring the performance of acts or the pursuit of a line of conduct on the part of both or either of the parties, though lacking such a provision, may be rescinded by a court of equity at the instance of one of the parties if the other persistently refuses or fails to discharge the duties devolving upon him thereunder or manifests a wrongful intention not to observe essential features of the contract, but to defeat its purpose, and there be no adequate remedy at law. The circuit court of appeals for the second circuit in Neenan v. Otis Elevator Co., 194 Fed. 414, 114 C. C. A. 376, rendered a decision which is helpful in the determination of this case. The syllabus which fairly represents the principles decided is as follows:

"1. Under a contract by which complainant assigned certain patents relating to elevators to defendant, a builder of elevators, which required defendant to test the patented apparatus with reasonable diligence, and if such test proved satisfactory 'within such further reasonable time as is convenient to put such apparatus into practical use' and to pay royalties thereon, the test having proved satisfactory, complainant was entitled to have the inventions exploited during the life of the patents and within a reasonable time.

"2. The failure and refusal by defendant, although continuously building and installing elevators, to make any practical use of such invention for five years after the making of the contract, was a violation both of its spirit and letter which entitled complainant to its rescission in equity; there being no rational rule of damages which would afford an adequate remedy at law."

Judge Coxe in delivering the opinion of the court said:

"The dilemma in which the defendant is placed by the proofs is this: The Neenan patents are either for valuable inventions or they are not. If worthless, the defendant will not be injured, but on the contrary will be benefited: by reassigning them on receiving the amount it has paid. If, on the other hand, the patents cover valuable inventions, the inventor is entitled to have them exploited during the lives of the patents. The gains, profits and advantages which may accrue from the patents the complainant is entitled to receive, either under the contract or as owner. It seems evident that no substantial gains will accrue to him under the contract. * * * The intention of the parties, at least the intention of Neenan, was to exploit the inventions as soon as possible. It was the duty of the defendant to test the apparatus with reasonable diligence and if the tests were satisfactory to install it within such reasonable time as was convenient. It did test the apparatus and found it satisfactory, but has wholly neglected to put it into practical use. Its conduct in this regard seems to indicate a purpose not to use the patented improvements but to prevent rivals in business from acquiring them. Manifestly, the defendant does not intend to push the introduction of the inventions in an enthusiastic and energetic manner such as the complainant has a right to expect. * * * It is not too much to say that the defendant, after it proved the invention to be a valuable one, wholly neglected to put it into practical use. This was not what the contract contemplated and was contrary to its spirit and letter as well. The complainant has no adequate remedy at law, no rational rule of damages can be formulated upon the facts as shown; any verdict rendered would have nothing but speculation and

guesswork to support it. In such cases the right of the injured party to rescind is well recognized."

For any violation by Crowe of the rights of the foundry company under the exclusive license, that company would have had an adequate remedy by an action at law for damages or by a suit in equity for an injunction and an accounting. But for the wrong done by the foundry company in retaining, without using, the exclusive license granted to it by Crowe the latter has no remedy for the recovery of royalties which do not exist, and an action at law for damages based upon a breach of the contract by the foundry company would be a wholly inadequate remedy for the reason that the amount of royalty which the foundry company should have paid to Crowe if it had in good faith manufactured the stokers under the exclusive license, would be wholly uncertain and speculative as depending upon elements and factors impossible of judicial determination.

[2] This suit being in equity and not an action at law the fact that there has been fault on both sides does not preclude the granting of proper relief to Crowe. There should, therefore, be a decree rescinding and annulling the contract of January 29, 1908, and enjoining the foundry company from operating or attempting to operate under the exclusive license in question, and imposing the costs and expenses of this cause equally upon the parties. In view of the circumstances of the case neither party is entitled to an accounting or to recover damages as against the other. A decree in accordance with this opinion may be prepared and submitted.