HENRY BRIGGS, appellant,

*v.*

UNITED SHOE MACHINERY CORPORATION, respondent.

[Decided October 21st, 1920.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"The bill in this case is filed by Henry Briggs, the inventor of certain patents assigned by him to defendant's predecessor, pursuant to the terms of a certain contract providing for the manufacture and sale by defendant of the patented machines and the payment of royalties to complainant, alleging, *inter alia,* the failure of defendant to account for and pay royalties to complainant as required by the contract and praying for an accounting and a decree for payment of the amount found due upon such accounting.

"The bill contains further allegations as to alleged fraud in connection with certain later patents, and a prayer for reformation of the written contract in case the meaning and effect of the

terms thereof should be construed differently from complainant's contentions in that behalf, but inasmuch as these were abandoned by complainant at the hearing, and no proofs adduced in support thereof, it is unnecessary further to consider them.

"The main controversy in the case rests upon the construction of the contract, and at the conclusion of complainant's case defendant renewed its motion to dismiss the bill, and was granted leave to reserve its evidence until the determination of the motion.

"In this situation the evidence of complainant is, of course, to be taken as true—and from it, and the allegations of the bill admitted by defendant's answer, the following facts are obtained:

"Complainant, Briggs, was, and had been for many years, an inventor, particularly, if not solely, in the field of shoe machinery, and from the year 1880 to the year 1901, when the contract before this court for construction was made, had been continuously in the employ of the Goodyear Shoe Machinery Company (the predecessor of the United company) and the United company. He had had twenty-one years' experience with these companies; was forty-seven years old, and might naturally be expected to have many years of future valuable mental activity.

"The sewing machine in use by the Goodyear company, up to the time of its absorption by the United company, was the invention of Briggs—that is, his inventions had made it a practical machine. Shortly before the contract he had made inventions for further improvements on this machine, and a new machine had been built by the Goodyear company, embodying said improvements.

"On February 1st, 1901, he had two applications for patents pending in the patent office for said improvements, one being an awl actuating mechanism and the other being an elastic tension device. Briggs had an oral agreement with the Goodyear company by which these patents were to be turned over to it, and when that company was merged with the United company about the year 1900, the United company desired a written agreement with Briggs. This written agreement was prepared and drafted

by Mr. Elmer P. Howe, director and general counsel of the United company, who previously had been counsel for the Goodyear company. Briggs had no counsel.

"A reading of the agreement shows that the United company desired to obtain from Briggs two things, first, the letters patent to be issued upon the pending applications for the two inventions previously mentioned, and second, to control all other and future inventions which Briggs had made and might make to this shoe sewing machine during the lifetime of Briggs.

"The contract provides as matters to be done and performed by the company:

" '1. To cause the two pending applications to be prosecuted to allowance with diligence; and upon the allowance and assignment by Briggs to the United company of his entire interest in the inventions, to pay to him the sum of $10,000.

" '2. To proceed forthwith to build shoe sewing machines embodying the said inventions, or some of them, and to offer them for sale or on lease and to pay to Briggs the sum of thirty dollars ($30) as a royalty for each sewing machine leased, sold or otherwise disposed of by it during the term of that one of the letters patent of the United States granted upon said pending applications which should be the last to expire.

" '3. To keep accurate books of account which shall show the sewing machines embodying the inventions * * * granted upon said pending applications, sold, leased or otherwise disposed of by it during the term of said patents * * * and to make true reports to said Briggs in the months of January and July of each year * * * and to pay to said Briggs the royalty * * * due as aforesaid * * * during the next preceding six calendar months.'

"Briggs on his part agreed:

" '1. Upon the payment to him of the sum of $10.000 to assign to the United company the two pending applications and the entire interest in the inventions therein described, and to request the commissioner of patents to issue letters of patent to the United company.

" '2. After the payment to him of the said sum of $10,000, to communicate promptly to the officers or counsel of the United company all inventions or improvements applicable to the sewing machine which he should thereafter invent or make, and to explain the same in such manner that the United company could reduce them to practice and embody them in its machines, and have applications prepared for the grant of letters patent therefor, and, without further consideration to be paid to him, to execute such applications, assignments and other written instruments to secure the grant of letters patent for the inventions or improvements described in the pending applications and for all other or

future inventions applicable to the sewing machine which he had at that time invented, or should thereafter invent, upon the condition that the entire expense attendant upon all such applications, &c., should be borne by the United company.'

"After the contract was executed, the patents were allowed in due course,' and assigned by complainant to the company, and he received the $10,000. He continued for some six or seven years to make further inventions and turn them over to the company, a breakdown in health finally causing a termination of his employment. It is conceded that he fully performed his part of the contract.

"As to defendant's performance—it paid to Briggs the $10,-000, and then proceeded, in accordance with the terms of its contract, to build sewing machines embodying his inventions, or some of them, and down to the year 1910 rendered accounts to Briggs every six months, and paid him royalties, the last payment being made in January, 1911. Since that date the company has failed to render accounts to Briggs, and has paid no royalties on the sewing machine.

"The defendant has, between 1910 and 1918, made and disposed of many sewing machines of the same kind as the machine to which complainant's awl actuating device and elastic tension device were added subsequent to the contract, but, although there is a bare allegation in the bill to the effect that defendant has between 1910 and 1918 made and disposed of many of these machines which did embody the two said inventions, and has not paid royalties thereon, there was no proof submitted thereof, and in view of the sole contentions made in complainant's argument, that claim, if, indeed, ever seriously advanced, has been abandoned.

"It is a fact, however, that defendant has, during the period in question, made and disposed of many of these sewing machines, which did not embody complainant's awl actuating device nor his elastic tension device, but which did embody inventions made by him subsequent to the contract, namely, a locking device and a yielding needle device, which are entirely different and distinct from the specific inventions mentioned in that contract.

"Complainant contends that under the provisions of the agreement, royalties were to be paid to him until October 15th, 1918 —that being the expiration date of the term of the later of the two patents granted on the applications in question.

"The sole grounds upon which he rests this contention are two:

"*First.* That under the true interpretation and meaning of the contract, defendant bound itself (under its agreement to proceed forthwith to build machines embodying 'said inventions, or some of them') to manufacture during the life of this contract as many machines with the said inventions of Briggs in them as it could by due and ordinary diligence find a market for; and if it failed to do this, and chose to manufacture its machines without using any of the Briggs inventions, and supplied the market demand therewith, it is liable to Briggs for the royalty on each such machine, as if it contained the Briggs inventions.

"*Second.* That if the first contention of the complainant is unsound and defendant could escape the payment of royalties at any time by ceasing to embody Briggs' two specific inventions in the machines, yet, as the machines which it has manufactured from 1910 to 1918 have embodied some of the subsequent inventions of Briggs, that the wording of the agreement, which states that 'the United company will forthwith build sewing machines embodying the inventions, or some of them,' applies as well to the subsequent inventions as to the two specifically mentioned.

"Complainant, in support of these contentions, cites a number of well-known rules of construction and proceeds to apply them to the facts in the present case. It is, of course, true that the sole purpose of interpretation or construction of a contract is to ascertain the intention of the parties thereto. It is equally true that such intention is to be gained from the instrument itself, and where the contract is perfectly clear and unambiguous in its language and provisions no resort is necessary nor will be made to any of the rules of construction (unless some latent ambiguity be proved). *Cf. Kelley* v. *Faitoute Iron and Steel Co., 87 N. J. Law 567* (at *p. 572*).

"Let us then examine the contract—and (considering complainant's two contentions in inverse order), first, that portion thereof, section 2, having reference to the payment of the royalties. 'The United company * * * agreed to pay to said Briggs * * * a royalty for each such sewing machine * * * disposed of by it during the term of * * * the letters patent,' &c. The words 'such sewing machine,' obviously, refer to the earlier part of the same paragraph—'sewing machines embodying the said inventions, or some of them.' The only prior use of the word 'invention' is in the preceding paragraph—'the inventions in said applications' (i. e., applications Nos. 706,478 and 17,368) 'described and claimed.'

"This would paraphrase the paragraph in question in this wise: 'The company will pay to Briggs a royalty for each sewing machine embodying the inventions (or some of them) described and claimed in said applications Nos. 706,478 and 17,-368 for letters patent, disposed of by it during the term.' &c. There is in this, obviously, no support for complainant's claim that the royalties are to be paid upon such machines as embody subsequent inventions.

"Complainant, however, argues that the words 'said inventions' should not be considered as limited in their reference to the contractual part of the instrument and to the word 'invention,' in paragraph 1 thereof, but may fairly refer back also to the recital portion of the instrument and the words 'all improvements on said machine which the said Briggs shall hereafter invent.' This argument might be conceded if this proposition stood by itself; but, looking at paragraph 2, we find that the first thing that is provided about the machine embodying 'said inventions' is that the company 'will forthwith proceed to build' them—the word 'forthwith' clearly referring to the date of the contract. It needs no argument to show that the company could not proceed at once to build machines embodying improvements which had not yet been invented, and which, indeed, might never be invented. It is evident, therefore, that 'said inventions' refers, and can only refer, to the specific inventions mentioned in paragraph 1.

"Nor is this all. In paragraph 3 the company agrees to keep books of account showing the number of machines disposed of by it, and the name of the vendees, and that Briggs shall have access to such books; that it will make reports to him at certain times of the machines sold, and make payment to him at certain times of the royalties. These provisions, it is perfectly obvious, are for the benefit of Briggs in obtaining payment of the proper royalties due him, and for no other purpose whatever. There is no other conceivable reason why Briggs should desire the company to keep these books or make these reports, nor why the company should promise Briggs to do so, except that Briggs might keep track of *all* of the machines on which he was entitled to royalty. Now, the provision of this paragraph, as to the books of account, is that they shall show 'the number of sewing machines embodying *the inventions,* or any of them, *described and claimed* in the letters *patent* * * * which shall be granted upon *said pending applications'* which shall be disposed of by defendant during the term. And the reports are to be made as to *'such machines'* and the royalties paid on *'such machines'*— the words 'such machines' in each case clearly referring back to the machines first mentioned (and the only machines mentioned) in that paragraph.

"There is, therefore, no possible room for doubt that the contract does not say, and does not mean, that royalties are to be paid to Briggs upon any other machines than those embodying the two specific inventions. The language and terms of the entire contract are not susceptible of any other meaning, however much we recognize Briggs' status as a layman and lack of counsel learned in the law. It must be borne in mind that we are dealing with the question of the meaning of the agreement as it is written, and executed, not with a question as to whether that agreement correctly conforms to the prior oral agreement; complainant does not seek a reformation of the instrument nor is there any evidence tending in the slightest to show that the instrument should be reformed.

"Turning, now, to the other argument advanced by complainant as ground for the relief sought, namely, that the effect of the provisions of the contract is to obligate defendant to

manufacture during the contract term as many machines embodying the specified inventions as it could sell with due diligence, and that if it instead manufactured and sold machines without these inventions, it is, nevertheless, liable to complainant for the royalty on each machine.

"There is, of course, no such express language in the contract —if there were complainant would not have had to bring suit. The language in two places in paragraph 2, and in three places in paragraph 3 (three of these five instances referring specifically to the payment of royalties, and the others referring to the keeping of accounts and rendering reports of the machines on which royalties should be paid), provides that the royalty shall be paid on each sewing machine embodying the specified inventions *'sold, leased or otherwise disposed of' by the company during the specified term.* There is no express provision that defendant will sell any specified number of machines, or for any specified period, or that it will not sell any other machines than those embodying complainant's inventions.

"There is a provision (paragraph 2) that it 'will forthwith proceed to build sewing machines embodying the said inventions * * * and will offer them for sale or on lease'; and it may be fair reading of this paragraph to associate this with the clause a little further on—'during the term of that one of the letters patent * * * which shall be the last to expire.' Admittedly, defendant did proceed to build the machines forthwith and to offer them for sale or on lease, and there is no proof, nor any contention by complainant, that defendant did not so continue to *offer* them for sale during the entire term.

"The requirement that the company shall forthwith proceed to build the machines and offer them for sale, undoubtedly, adds a material obligation to the obligation to pay royalty on each machine sold, but that such additional obligation goes to the extent contended by complainant I cannot agree. To my mind the word 'forthwith' may well be the word of most importance in this clause. I mean by that that the clause may have been inserted in the paragraph to insure to Briggs that there should be no delay in the manufacture and sale of the machines. If there were such delay his royalties would be de-

layed, and would also be lessened, because there would be fewer machines sold before the termination of the term of the patent or before the possible invention of some superseding device. Certainly, even assuming that a provision is to be implied, to the effect that the company will build and sell with all due diligence, I can see no warrant for reading into the contract a requirement that it will continue to sell and sell no other machines, notwithstanding some superseding device be invented and developed.

"Complainant, in support of this contention, relies strongly upon the opinion of the court of appeals of the District of Columbia in. *Eclipse Bicycle Co.* v. *Farrow, 16 App. D. C. 468;* affirmed, it is said, by the supreme court of the United States in *199 U. S. 581.* The contract involved in that case was in many respects similar to the one now *sub judice,* and the company there had, subsequent to the execution of the contract and acquirement of the patent right, adopted other devices instead of Farrow's device in the machines manufactured by it and refused Farrow further royalties. The District of Columbia court of appeals held that the company could not thus relieve itself from the payment of royalties; but that the company having made the contract was bound by its terms, took the risk of new inventions superior to the one contracted for and must pay Farrow the royalty on each machine made, although not embodying the Farrow device.

"There is, however, a very important distinction between the contract in that case and the one in the case at bar. In the Farrow contract the assignee of the patents bound himself in express terms to 'use due business diligence in the manufacture and sale of the devices embodied in said letters patent and to push the sale by all proper and legitimate enterprise.'

"Moreover, the supreme court, so far from affirming the holding of the court of appeals, upheld it only in part. There were two devices adopted by the company in substitution for the Farrow device—one of them (the Morrow device) being, as the supreme court holds, a mere mechanical equivalent for the Farrow device; and the company, in its machines having the Morrow device, was therefore 'embodying the Farrow invention,' and was

therefore required by its contract to pay royalties to Farrow on such machines. The other device (referred to in the opinion as '*E 10*') it finds, and holds, to be an entirely different and distinct invention from that of Farrow, and reverses the decision below which required the payment of royalties to Farrow on machines with the '*E 10*' device. The following excerpt from the supreme court opinion will serve to show that not only is that case not authority in support of complainant's contention, but, on the contrary, it is authority for the direct opposite thereof:

" 'Obviously, also, the fact that, subject to the foregoing qualifications, the defendant took the risk of the value of Farrow's alleged invention, even when coupled with its covenant to use due business diligence in pushing their sale, did not preclude it from using any later invention, if one were made which superseded Farrow's and did not embody it. Due business diligence would not require it to enter into a hopeless contest, and would not prevent it from avoiding such a contest by purchase. In that event it would not be accountable to Farrow for royalties on the new machine.' Citing *Thorn Wire Hedge Co.* v. *Washburn & M. Mfg. Co., 159 U. S. 423.*

"Upon the authority of these opinions of the federal supreme court, therefore (which, if not controlling, are entitled to great weight), the contention of complainant in this behalf falls—for he presented no evidence, nor does he contend that the machines sold by defendant on which royalties have not been paid, embodied his inventions of the awl actuating device or the elastic tension device; indeed, on the contrary, he admits in his bill of complaint that the invention of the Eppler device, which was used in the machines (on which royalty was not paid) instead of his device, 'largely, if not wholly, supersede the inventions' covered by the patents issued to complainant on the two applications specifically mentioned in the contract.

"Complainant also lays great stress upon certain rules of interpretation, as before mentioned—commencing with the rule that the court in ascertaining the meaning of the instrument, will place itself in the situation and circumstances of the parties at the time of execution. All the other rules relied on by

complainant depend for their application upon the existence of a doubt or ambiguity. Unless such doubt or ambiguity exists, they have no relevance whatever. And since I find no doubt or ambiguity, they need not receive further consideration.

"There is, as I have already pointed out, no doubt or ambiguity in the express terms of the agreement. It clearly provides for the payment of royalties only upon machines disposed of by defendant during the term which embody complainant's two specific inventions. It is absolutely devoid, either in express terms or by necessary or ·reasonable inference, of any requirement to manufacture and sell machines embodying complainant's inventions in any particular number or for any particular time, or after a superseding invention arose, or after it became for any reason a poor business proposition for the company to do so—and, on the authority of the cases above referred to, the law implies no such provision in the contract.

"Complainant, however, argues that the application of the rule as to the court's putting itself into the position of the parties at the time of the execution creates or proves the existence of a doubt or ambiguity not apparent from the terms of the contract itself  What the circumstances of the parties were has been substantially set forth earlier herein. It is unnecessary to repeat in detail the argument of complainant in this behalf; summed up it amounts to contending that the contract is unfair and inequitable to him, and is not such as a reasonable man would make under the circumstances, and, therefore, a different meaning should be ascribed to it than is expressed by its terms.

"Assuming, *arguendo,* the truth of complainant's premises, I have already pointed out that the question of the fairness or reasonableness of a contract becomes relevant, on a question of determining the meaning of a contract, only where the contract is susceptible of more than one meaning of contrary nature or effect. But where it is not so susceptible, the court cannot change the sole meaning which it has. This contract is not susceptible of the meaning which complainant contends, even when regard is had to the surrounding circumstances. Complainant says, 'because of those surrounding circumstances, it is clear that the contract is unfair to me, therefore, although I signed it,

its meaning should be changed so as to make it fairer in its terms.' This is a very different thing from saying 'this contract, according to the usual meaning of the words employed, would mean one thing, but I, being of a certain class of society, or of a certain calling or trade, meant by those words not their ordinary meaning, but the meaning which they have to persons in my situation and circumstances.' Complainant is asking a reformation of the contract under the guise of interpretation.

"If the contract be unfair and inequitable to complainant, and defendant were the party seeking the aid of equity in its enforcement, that aid might be denied upon the ground of its unfairness or inequitableness to complainant. But I know of no principle which would permit this court or any other to change a contract at the instance of complainant in order to proceed to enforce the changed contract against defendant who had never made such a contract—no matter how inequitable or one-sided the contract might be.

"Moreover, I am by no means willing to concede that the agreement is in fact one-sided or unfair to complainant. Regard is to be had of *all* the circumstances and of *both* parties—not merely complainant. Complainant on his part gave what both parties believed to be a valuable invention, and gave up the possibility of further profit to himself from any further inventions to that particular machine. On the other hand, defendant gave and complainant received $10,000 in cash and royalties on the machines it should make and sell embodying this invention. Complainant might never invent anything else—he might have died the next day. Complainant took no greater risk of loss of profits to himself from this invention caused by the arising of a superseding invention, in this assignment and royalty contract, than he would if he had gone into the manufacture and sale of the devices himself—indeed, not as much, for, in the latter case, he would risk his capital investment, too. Complainant says the royalty part of the consideration was the large, the important element thereof, far exceeding the $10,000 cash. But there is no proof of this. It does not appear whether the $30 royalty was a large or small one, nor how many machines had been made per annum in prior years, nor how many might be expected to be

marketed in the future. It does not appear what comparison the $10,000 bore to his salary from defendant. Ten thousand dollars was a very substantial sum (much more so in 1901 than now), and if a superseding device had arisen within a short time after the contract, or if the device had proved a practical or commercial failure, defendant would have received nothing for its $10,000 and for the loss of its capital invested in the manufacture of these machines, but the right to complainant's future inventions on that machine—which might be none or worthless. Many, perhaps, most, contracts of this kind are simply assignments of the invention, upon a promise to pay royalties, not comprising any cash payment on the one hand or agreement to assign future improvements on the other. If the royalty here were a fair and reasonable one for such a contract (and there is no proof that it was not), then how can it be said that $10,000 was not a fair price for the future improvements complainant might make?

"The result of the views which I have set forth renders unnecessary any consideration of some other grounds urged by defendant.

"A decree will be advised dismissing the bill, with costs."

*Mr. Edward L. Katzenbach,* for the appellant.

*Messrs. McCarter & English,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, ACKERSON—10.

*For reversal*—None.