**MECHANICAL ICE TRAY CORPORATION et al. v. GENERAL MOTORS CORPORATION.**

No. 378.

Circuit Court of Appeals, Second Circuit.

Aug. 26, 1944.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis and Daniel V. Mahoney, both of New York City, of counsel), for plaintiffs-appellants-appellees.

Drury W. Cooper, of New York City (John N. Cooper, of New York City, of counsel), for General Motors Corporation.

Before AUGUSTUS N. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

Mechanical Ice Tray Corporation and I. C. E. Corporation brought this suit against General Motors in the District Court for the Southern District of New York for an accounting and to recover royalties alleged to be due the plaintiffs for ice trays manufactured and sold by the defendant since April 1, 1940, under the terms of a license agreement the parties had made covering the manufacture, use and sale of ice trays for mechanical refrigerators under certain U. S. patents owned by Mechanical Ice Tray Corporation. Jurisdiction based on diversity of citizenship was alleged and is clear and undisputed.

By amendment to the complaint, the plaintiffs alleged that the license was an exclusive one and that the defendant had failed in violation of its implied obligation so to do, to exploit the licensed inventions in good faith and to refrain from adopting commercially equivalent devices outside the scope of the claims of the patents included in the license agreement.

The defendant answered by denying that it had since April 1, 1940, manufactured and sold without paying royalties any ice trays which were within the claims of the patents; denied that any royalties were due the plaintiffs; denied that it had broken any implied obligation to exploit the licensed devices in good faith; and alleged that no such implied obligation could exist

because it would be contrary to public policy.

The trial court found that the defendant had not manufactured and sold any ice trays which were within the scope of the licensed patents without paying royalties to the plaintiffs. It did, however, find that the defendant had manufactured and sold an ice tray, known as type 4, which was a breach of its implied obligation to exploit the patents and awarded damages computed on the basis of the royalties agreed upon by the parties to the license. Both parties have appealed from the decree.

Though the license agreement covered other patents, the present controversy is confined to claims 13 and 17 of U. S. Patent No. 1,893,535 granted to Buchanan on January 10, 1933, and to claims 8, 9, and 14 of U. S. Reissue No. 18,819 granted to Buchanan and Horton on May 2, 1933. Ice trays, called types 2, 3, and 4, manufactured by the defendant without payment of royalty since April 1, 1940, are the ones involved.

A license was originally granted to the defendant by I. C. E. Corporation on August 21, 1934. Thereafter Mechanical Ice Tray Corporation, which claimed to own an interest in the patents, became a party to it. That agreement is the one on which this suit is based. It is dated April 1, 1936, and provides, so far as need now be stated, that the defendant was exclusively licensed under the patents within the United States, except in the County of Roscommon, Mich., with the sole exception of a non-exclusive license which had been granted to Westinghouse Electric & Manufacturing Company. It was agreed that if the Westinghouse license should be terminated the defendant should become the sole licensee. A minimum royalty of $5000 a year was payable to the plaintiffs and unit royalties were payable in amounts varying in accordance with the kind and number of ice trays sold each year.

Mechanical agreed to sue infringers upon the written request of the defendant and if it failed to do so within thirty days the defendant was given the right to prosecute infringers in its own name and at its own expense. Mechanical also agreed to defend any suit brought against defendant, its sublicensees, or customers or users growing out of the manufacture and sale of ice trays in accordance with the claims of the licensed patents. The license could be cancelled by the defendant upon ninety days' notice to the plaintiffs at any time after December 31, 1938, and the plaintiffs could cancel in the same way for any material breach by the defendant but during the notice period the defendant might repair the breach and thereby keep the license in effect. The defendant also was given the right to surrender the exclusive license at the end of any calendar year and retain a non-exclusive license. If it did so it was no longer bound to make the guaranteed minimum royalty payments.

At the request of the defendant four suits were brought against alleged infringers. Three of them were settled before trial. The fourth was against Abraham & Straus upon claims 4, 13, 17 and 19 of Buchanan Patent No. 1,893,535. It was tried in the District Court for the Eastern District of New York and decided March 8, 1940. The result was a decree holding the claims valid but not infringed as they were then construed. See, Mechanical Ice Tray Corp. v. Abraham & Straus, Inc., D.C., 31 F.Supp. 938. No appeal was taken from that decree and that fact plays an important part in the present controversy.

Paragraph Eleventh (b) of the license agreement provides in part as follows: "It is understood and agreed that in the event any of the claims of any of said patents are construed or held invalid by a decision of a court of competent and final jurisdiction, or by an inferior court from whose decree no appeal is taken within the time required by law, then the requirement to pay royalties under this license with respect to any such claim or claims shall be interpreted in conformity with the court's decision as to the scope or validity of such claims of said patents so that no royalty shall be payable under such claims after the date of such decision upon any ice tray which has heretofore been deemed made under such claims of any such patents and hence subject to royalties hereunder solely because they fell within the claims so held invalid or construed * * *."

After April 1, 1940, following this decision, the defendant stopped paying royalties on the trays, type 2 and 3, which it continued to manufacture without change in construction. It also changed the construction of other trays it made to what was essentially that of type 2 and 3 but was called type 4 and paid no royalties on that.

It will be convenient to discuss first the original cause of action to recover royalties claimed due under the license. Whether there are any depends upon whether any

type 2, 3, or 4 ice trays made by the defendant would, but for the license, infringe either claim 13 or claim 17 of Buchanan Patent No. 1,893,535 as construed in the above suit or claims of Reissue Patent No. 18,819 since the plaintiffs now rely on no others.

Before this invention, ice that was frozen in metal trays of a mechanical refrigerator could not be readily removed until it had melted sufficiently to reduce the pressure between the ice and the sides of the tray caused by the expansion of the water during freezing or otherwise loosen the bond between ice and metal. By "sides of the tray" in this connection are meant the sides also of the metal insert which was placed in the pan to cause the ice to freeze into blocks of convenient shape and size which are called cubes. This insert is called a grid and is usually made of a piece of metal of a length to fit the inside of the pan longitudinally. Extending crosswise from it at intervals are pieces of metal, called fins, which with the middle piece divide the pan into spaces with sides approximately as high as the pan. The melting needed to permit the cubes to be removed from the tray was often caused by letting hot or cold water run over the tray and the ice. It was sometimes accomplished by letting the tray with the ice stand at room temperature for a sufficiently long time. However it was done, there was a wastage of ice and a somewhat vexatious consumption of time and effort.

The invention disclosed in the licensed patents and covered by the claims above mentioned did away with much of the trouble in a simple and effective manner. A cam placed at one end of the tray could be turned to exert sufficient pressure against that end of the grid so that the latter was raised a little from the pan. This raising of one end of the grid was sufficient to break the ice along the entire length of the tray. Then the grid could be lifted wholly from the pan, and the cubes, which would still be frozen to the grid, could be released from it by melting or breaking. The characteristic feature of patent No. 1,893,535 is the raising of the grid from the pan by the use of enough force mechanically applied through a cam to break the ice loose from the pan.

In the Reissue Patent No. 18,819 an improvement was disclosed which carried the same process to the grid itself by making part of it move relative to the remainder when the moveable section of the grid was raised from the pan and so the cubes were broken loose both from the grid and from the sides of the pan, i.e., from the tray as a whole.

The fins of the grid were made in separate pieces and those forming the outer ends were attached to the pan. The middle portion of the grid alone could be raised. That was done by a bar, flange and gears at one end which were a fair equivalent of the cam in No. 1,893,535 but in one form a supplemental lever was shown at the other end which had a flange extending over that edge of the pan. When the handle of the lever was raised this edge of the pan served as a fulcrum and thus that end of the grid was raised from the pan. There were nubs on this moveable portion of the grid which became frozen into each ice cube between the fixed parts of the fins and prevented the cubes from breaking away from the moveable part of the grid without being broken from the stationary part and from the pan.

The defendant, after obtaining its license, manufactured, used, and sold a large number of trays which the parties supposed were within the licensed claims, and paid royalties on them. They had no cam but instead used a lever attached to a longitudinal member of the grid with upper and lower sections which were relatively moveable toward the front and the back of the pan as the lever was raised or lowered. Fins on either side of this middle member were attached to it in such a way that they would tilt as the lever was raised and would rock back and forth as it was raised and lowered. This motion of the middle member in the grid and of the fins not only relative to the pan but to one another and to the two-part longitudinal piece so loosened the ice that it would wholly, or for the most part, then be free from the pan and grid. On the trays of the defendant called types 7 and 9, the latter being the first tray made under the license and having mechanism for moving the middle member and fins somewhat, but now immaterially, different from that of type 7, the lever was attached to the longitudinal pieces of the grid near their ends and had one end made to overlap the top of the edge of the pan. As this lever was raised the overlapping end would engage the top of the pan which acted as a fulcrum. This use of a lever having the edge of the pan for a fulcrum caused the entire grid to move up from the

pan by means obviously the equivalent of the cam of No. 1,893,535. When such an overlapping end was used on that lever, royalties were payable on the trays so made and no one claims the contrary. So long as the defendant did that it paid royalties as the license provided.

Types 2 and 3 were trays made by the defendant with similar grids, but the lever was attached to the longitudinal pieces at or near their center. Movement of the lever did not bring any part of it into contact with the pan and caused only such movement of the fins relative to each other and to the longitudinal pieces and the pan as could be thus accomplished. Until the decision in the Abraham & Straus suit, these two types were thought to be within the license and the defendant paid royalties on them. After that decision it contended that types 2 and 3 were not within the claims and refused to pay any more royalties on them. It also changed the type 7 tray, which had apparently superseded type 9, to what is called type 4 simply by using a lever which did not have an end overlapping the top of the pan. The lever was left near the end of the grid in type 7, but the added lifting movement of type 7 was eliminated by discontinuing the use of the edge of the pan as a fulcrum and type 4 operated as did types 2 and 3, but with a lever less centrally located on the grid.

■■ Because of the provision in the license above quoted, the claims of patent No. 1,893,535 in this action must be given the same limited scope they were given in the Abraham & Straus suit. Unless defendant's tray types 2, 3 and 4 do therefore fall within these claims as so construed, no royalties on them are now due for they do not have a grid in part moveable and in part stationary which is a distinguishing feature of the reissue claims.

The tray alleged in that suit to infringe had fins attached to a divided longitudinal member. Extending the length of this divided member between its two parts was a metal piece near the top which was moveable on its axis. When it was turned this metal piece caused the divided member of the grid to spread apart. This made the ice move outwardly from it and broke the ice from that member and from the fins and the sides of the tray. The ice was, of course, somewhat lifted from the tray because movement upwardly, as the divided member was expanded outwardly, was unrestrained except by the bonding of the ice

to the tray by freezing and by the weight of the ice and grid. Movement in other directions was restrained by the bottom and sides of the pan and was permitted only to the extent they would flex. The moving force was applied through a cam in substantially the same way it was in the Buchanan patent. The importance of that decision for present purposes lies in the fact that the claims of the patent sued upon were construed not to cover such an incidental lifting of ice and grid. Judge Campbell so held and the plaintiff did not appeal. Concerning the inevitable, slight movement of the grid up and away from the tray when the ice was freed from the metal Judge Campbell wrote as follows: "The expanding bar of the defendant's device is a cam, but is not used nor is it directed to be used for raising a grid in a tray, and even if plaintiff be correct in its contention that in the defendant's device in the presence of ice, there is some upwardly movement of the grid, of extremely small proportions, when the bond of the ice is broken, in expanding the grid, there is no such structure camming up of the grid from the tray thereby breaking the ice from the tray as is all that is taught and shown in the patent in suit, nor equivalent thereof." Mechanical Ice Tray v. Abraham & Straus, Inc., supra, 31 F.Supp. at page 946.

■ In the instant suit, it was proved that when the fins of the grid were turned by the lever there was a pivoting of each cube on one edge at the bottom of the pan which caused a slight raising of the opposite edge of the cube unless the flexing of the bottom of the pan under pressure allowed compensating downward movement there. In any event this raising was slight and incidental. It is in the same category with that in the Abraham & Straus case which now controls decision on the scope of the claims. What Judge Campbell said in his opinion in the above case immediately following the part already quoted applies here as well. "Defendant's structure is mechanically different from that of the patent in suit, works in a different way, and accomplishes a different result. The difference is not one only of form, but a substantial difference in substance." We, therefore, find no error in the judgment below denying recovery of royalties.

The second cause of action is based on the duty of an exclusive licensee on the unit royalty basis to exploit in good faith, and its alleged breach. The theory of that

cause of action is that the productiveness of the licensor's property having been placed solely within the control of the licensee, a covenant on its part to work the patent in good faith to make it produce royalty income will be implied.

■■ The principle is well established with respect to a wide variety of contracts in which the consideration for a grant of property lies wholly in the payment of "sums of money based upon the earnings of property transferred." In re Waterson, Berlin & Snyder Co., 2 Cir., 48 F.2d 704, 709. It has been applied in the case of such diverse transactions as the granting of the exclusive right to place the licensor's endorsement of approval on the dress designs of others (Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214), to quarry stone (Stoddard v. Illinois Improvement Ballast Co., 275 Ill. 199, 113 N.E. 913; Ellis v. Swan, 38 R.I. 534, 96 A. 840), to sink and operate oil wells (Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N.E. 502), to transport cargoes (Great Lakes & St. Lawrence Transp. Co. v. Scranton Coal Co., 7 Cir., 239 F. 603), to mine gold (Pritchard v. McLeod, 9 Cir., 205 F. 24), and to exploit a musical composition (In re Waterson, Berlin & Snyder Co., supra). And see, Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., D.C., 44 F.Supp. 391. It has been held that such a contract includes an implied negative covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Uproar Co. v. National Broadcasting Co., 1 Cir., 81 F.2d 373, 377, certiorari denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393.

In a number of cases an express covenant to exploit a patent has been enforced against an exclusive licensee. See Neenan v. Otis Elevator Co., 2 Cir., 194 F. 414; Crowe v. Oscar Barnett Foundry Co., D.C., 213 F. 864, modified 3 Cir., 219 F. 450; Carbo-Frost, Inc., v. Pure Carbonic, Inc., 8 Cir., 103 F.2d 210, certiorari denied 308 U.S. 569, 60 S.Ct. 83, 84 L.Ed. 478; Matzka Corp. v. Kelly Dry-Pure Juice Corp., 19 Del. Ch. 359, 168 A. 70; DeStubner v. Microid Process, Inc., 121 W.Va. 773, 6 S.E.2d 777.

■■ We think this license made the defendant an exclusive licensee though it is true that the non-exclusive license to Westinghouse remained in effect. The argument that the Westinghouse license prevented the defendant from becoming an exclusive licensee does not take wholly into account the legal meaning of that term. As this court explained in Western Electric Co. v. Pacent Reproducer Corp., 2 Cir., 42 F.2d 116, certiorari denied 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771, it is not the equivalent of "sole licensee." A license can have the attributes which make it exclusive in the legal sense though it is not the only license. There may be one or more previous licenses which are non-exclusive and by contrast with the exclusive license are called bare. When this is so the exclusive license does not, of course, cover the entire field but it binds the licensor not to enlarge thereafter the scope of other licenses already granted or increase the number of licenses. It is plain that these parties intended that the defendant should to that extent be free from competition in the manufacture and sale of trays made under the licensed patents and it is equally plain that they expected the defendant to make and sell trays on which royalties would become due and not merely to pay a guaranteed minimum royalty. The license provided that, "All guaranteed minimum royalties paid * * * shall be considered as advance royalty payments and shall be credited against royalties earned under Article Sixth hereof, regardless of when said royalties are earned."

But even though the defendant is an exclusive licensee, there is some doubt whether that part of its duty to exploit the licensed trays in good faith which involves refraining from entering into competition with them has survived in a practical sense the decision in Mercoid Corp. v. Mid-continent Investment Co., 320 U.S. 661, 64 S. Ct. 268. Although the defendant has argued with much force that public policy no longer permits an exclusive licensee to be so restricted in action, a majority of the court does not believe decision on that point is necessary on this appeal.

■ Whatever may be left of the rule of implied covenant of an exclusive licensee to exploit the licensed device in good faith rests, as the doctrine always has rested, upon the ground that not to hold the licensee to that standard of conduct would be unfair and inequitable as between the parties to the license.

■ There is one well recognized exception to the doctrine as it has previously been applied. That is where there is outside competition which the exclusive

licensee cannot meet with reasonable chance of success with the licensed article. Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317; Carbo-Frost, Inc., v. Pure Carbonic, Inc., supra; Briggs v. United Shoe Machinery Corp., 92 N.J.Eq. 277, 114 A. 538. If such competition comes from something not commercially better than the licensed device he must meet it by means of the latter. If he sees fit to overcome the competition by purchasing the right to make the competing article, he cannot substitute the latter for the licensed device without thereby violating his covenant to exploit so long as he retains an exclusive license. But if the competition comes from a better article than the one licensed, he is under no obligation to try with no hope of success to meet it with the licensed device. Compare, Parev Products Co. v. I. Rokeach & Sons, 2 Cir., 124 F.2d 147. Faced with such a business situation he may, if he can, obtain and exercise the right to make or use the competing article without violating any obligation to exploit under his exclusive license. Eclipse Bicycle Co. v. Farrow, supra; Carbo-Frost, Inc., v. Pure Carbonic, Inc., supra.

Paragraph Eleventh (b) of the license shows that the parties contemplated that their construction of the patent claims might be narrowed by court decision and that, if they were so narrowed, devices which the defendant had made and on which it had paid running royalties could thereafter be manufactured and sold royalty-free. The trays of type 2 and 3 were in this category. The continued manufacture, use and sale of them without payment of running royalties was, therefore, permissible in accordance with the express provisions of the license and no obligation to the contrary can be implied.

Otherwise, however, any obligation to exploit in good faith remained unaffected, for there was no competition to justify a failure by the defendant to do so. The court below found in accordance with sufficient evidence that "Defendant's type 7 tray did not differ materially from and was the commercial equivalent of its type 4 tray. The only reason defendant began manufacturing the type 4 tray in October 1940 was to avoid the payment of royalties to plaintiffs on the type 7 tray under the April 1, 1936, agreement. To accomplish this purpose the lever of the type 4 tray was so shaped and positioned as not to fulcrum on the flange of the tray but on the longitudinal member of the grid. The action of the defendant in making this change was not attributable to any competition." It was in view of this action of the defendant so motivated that the trial judge held that there had been a breach of an implied covenant to exploit.

█ Assuming, arguendo, that there was an implied covenant not to compete with the licensed trays except to meet outside competition, this manufacture and sale of the type 4 tray was not a breach of it provided the parties had agreed that the defendant might make and sell that tray royalty free. The exercise of good faith in exploiting the licensed patents did not require the defendant to refrain from doing whatever the plaintiffs had expressly agreed that it might do. No obligation not to manufacture and sell whatever kind of trays the license gave the defendant the right so to manufacture and sell can be implied and of course there can be no breach of a nonexistent obligation.

Although the type 4 tray was correctly found to be a modification of the type 7 tray, it was in fact also no more than a modification of the type 2 and type 3 trays. The court found that "Type 4 embodies the moveable transverse sections of types 2 and 3 and the two-part structure of the longitudinal member of the grid of type 3. In structure and mode of operation to effect the release of ice blocks from the grid it is quite similar to types 2 and 3." The similarity in operation just mentioned is so close that it is identical. The only mechanical difference is that already mentioned which is the attachment of the lever of type 4 to the grid near one end instead of nearer the center as in the 2 and 3 types. Mechanically the three types, 2, 3 and 4 are equivalent.

█ There was no covenant, express or implied, limiting the number of types 2 and 3 trays which the defendant could manufacture and sell after the Abraham & Straus decision. As type 4 was mechanically, structurally, and commercially the equivalent of types 2 and 3 the manufacture and sale of it was included in the permission to manufacture and sell such trays without limitation.

It should be noticed that the defendant is not charged with having failed to manufacture and sell any trays under the license after the Abraham & Straus decision. The record shows that it did continue to sell

type 7 trays and sold 1,440,000 on which it paid royalties between April 1, 1940 and December 1, 1942. The second cause of action was therefore not proved and the judgment thereon must be reversed.

Judgment affirmed as to the first cause of action and reversed as to the second.

FRANK, Circuit Judge (dissenting in part).

On the issue of the breach of defendant's equitable obligation, I think that Judge Leibell was correct, for the reasons excellently stated in his opinion, and that his decree should be affirmed. Before the execution of the present license agreement, defendant had been making and selling types 2 and 3. Clause 11 of the agreement, coupled with the decision of Judge Campbell in the Abraham & Straus case, put defendant in the position it would have occupied if the agreement had provided that types 2 and 3 were not within the patent claims and that defendant could continue, free of royalties, to make and sell them. It was as if originally the parties had expressly agreed that, although defendant was required to exploit the patent, it was not required to discontinue making and selling types 2 and 3, despite the fact that they competed in part with the patented device. But, had the agreement expressly so provided, defendant's obligation to exploit the patent would have required it, nevertheless, I think, not to reduce the number of its sales of the patented device by making and selling a wholly-new device like type 4 which, although not covered by the patent, was even more directly competitive within the patented device and better than types 2 and 3, unless there arose (as there did not here) outside competition that could not be successfully met with the patented device.[1]

Defendant played dog-in-the-manger from November 1940—when it began the substitution of type 4 for type 7—until at least the date of the decree, October 11, 1943, and, for all we know from this record, up to now. Under the contract, it could have relieved itself of its equitable obligation either by surrendering the license or by accepting a non-exclusive license. It did neither. It retained its original license, thereby preventing plaintiff from manufacturing and selling type 7 in competition with defendant's new type 4. I do not believe that, when the parties agreed upon clause 11, they had any such result in mind, that they meant that defendant could thus, in part, place plaintiff's patent on ice. In other words, I do not believe that they intended that, should a court decision narrow the patent claims in any respect, the defendant, still retaining its right to keep plaintiff from using the patent, could itself reduce the sales of the patented device while making and selling a competing article which it had not therefore made and which no one else was making or selling or threatening to make or to sell. Nor can I agree that, on any principle of fairness or public policy, we should, without regard to the parties' actual intention, read into the contract a "constructive" intention[2] to permit such anti-social conduct, which, I think, closely approaches (if, indeed, it does not reach) illegality.

My colleagues say that the defendant is not charged with having failed to make and sell any trays after the Abraham & Straus decision, and that it did continue thereafter to sell type 7 trays. But the sales of type 4 trays go to show that the sales of type 7 trays were substantially reduced. As type 4 is inferior to type 7 but more directly competitive with type 7 than are types 2 and 3, it is obvious that the sales of type 4 derived from defendant's desire to escape royalty payments. It is also obvious that defendant's course of conduct reduced the availability to the public of type 7 trays.

It is true that the doctrine of the Paper Bag Patent cases (Continental Paper Bag Co. v. Eastern Paper Bag Co.) 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122, allows a patentee to refrain from manufacturing and selling the patented device and yet to stop others by injunctions from making or selling it.[3] Whether that doctrine still lives has recently been doubted by Judges Arnold and Miller.[4] Be that as it may, the

---

[1] There is no evidence of even a threat of outside competition of that kind.

[2] That obligations thus "implied" have nothing to do with the actual intention of the contracting parties but are imposed by the courts because of policy considerations, see Beidler & Bookmyer, Inc., v. Universal Ins. Co., 2 Cir., 134 F.2d 828.

[3] For comments on suggested expedients to meet criticisms of that doctrine, see concurring opinion in Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632.

[4] Special Equipment Co. v. Coe, —— U.S. App.D.C. ——, 144 F.2d 497.

far-flung extension of that doctrine which began with the Dick case [Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880], was repudiated in 1931 in Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and again in 1941, in Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. And, cutting across the Paper Bag rule, the courts developed the doctrine of the obligation of an exclusive licensee not to deprive the public of the benefit of the patent. As this latter doctrine promotes the public interest, it is surprising that the defendant should urge that it is inconsistent with, and should be abandoned because of, such recent cases as Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165, or Mercoid Corp. v. Mid-continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, or Nachman Spring-Filled Corporation v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, and should quote in favor of its position this statement from the Mercoid case [320 U.S. 661, 64 S.Ct. 271]: "The patent is a privilege. But it is a privilege which is conditioned by a public purpose."[5] The decisions cited by defendant, which stress the limited constitutional basis for congressional authorization of patent monopolies, have insisted that patent rights should not be utilized to repress competition unduly. Yet defendant here asserts, with my colleagues' approval, that it may employ its license to reduce competition between types 4 and 7, thereby barring the public from receiving the advantages of the exploitation of plaintiff's patent.

The decision of my colleagues involves, I think, an unnecessary and undesirable corollary to the Paper Bag doctrine, suggesting to those interested in stifling competition a new-fangled method by which a patent, constitutionally issuable only if it will "promote the progress of the useful arts," may be made a means of impeding that progress.

---

[5] Defendant suggests that the implied equitable obligation doctrine should now be abandoned because it compels the conclusion that, even if a patent is invalid, the licensee cannot make or sell a competing device. But Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, serves, in most instances, to answer that contention. Moreover, the defendant here could not be thus hemmed in, since, as above noted, it reserved the right to surrender its license.