DAIRYMEN'S LEAGUE CO-OPERATIVE ASSOCIATION, INC., Respondent, *v.* MERLE HOLMES and Another, Appellants, Impleaded with MARY HOLMES, Defendant.

Fourth Department, January 2, 1924.

Corporations — membership corporations — contract by defendants to deliver all milk produced by them to plaintiff as sales agent — action by plaintiff, membership corporation, to recover stipulated damages for breach of contract — contract by defendants signed by third person at their request was ratified by defendants — defendants are not members of plaintiff — contract contains no direct agreement by plaintiff — agreement by plaintiff to receive all defendants' milk and use reasonable efforts to sell same may be implied — implied promise is sufficient consideration — provision in contract for pooling receipts for products and distributing same pro rata among producers is lawful under Membership Corporations Law, § 208 — " overhead expenses " as used in Membership Corporations Law, § 208, defined — provision in contract for deduction from non-members of amount to be determined by plaintiff for capital expenditure and issuance of certificates payable at option of plaintiff is illegal — deduction for subscription to Dairymen's League News unauthorized — defendants not estopped from raising question of ultra vires as to unexecuted part of contract — penalties — provision in contract for liquidated damages amounting to $1,200 construed as providing for penalty.

In an action to recover stipulated damages for the breach of a contract by the defendants to deliver all milk produced by them to the plaintiff as sales agent, the contract which was signed for and in the name of the defendants at their request

**430** DAIRYMEN'S LEAGUE CO-OPERATIVE ASSN., INC., *v.* HOLMES.

Fourth Department, January, 1924.                    [Vol. 207

by a third person was ratified by the defendants, since it appears that after the contract was made the defendants delivered milk in accordance with its terms.

While the contract in question contains no specific agreement on the part of the plaintiff to do or perform any act, still it may be implied from the contract whereby the defendants agreed to deliver all their milk products to the plaintiff as selling agent, that the plaintiff agreed to receive or arrange for the receipt of all the milk and milk products of the defendants and to use reasonable effort to make sales of the milk and milk products covered by their agency at reasonable market prices, and the agreement so implied furnishes a sufficient consideration to support the contract.

The provision in the contract, that the receipts for the sale of milk and milk products delivered to the plaintiff by all producers should be pooled and that from the general fund so created each producer would be paid his *pro rata* part of the receipts based on the quantity of the products delivered by him, is authorized by section 208 of the Membership Corporations Law.

"Overhead expenses," as used in section 208 of the Membership Corporations Law, providing that in no case shall a membership corporation formed under article 13-A of the Membership Corporations Law charge a non-member for services in selling his product more than the actual cost thereof, "including the *pro rata* part of all overhead expenses," may be defined to include the continuous expenses of the business irrespective of the outlay on particular contracts and may possibly include depreciation and interest, but it would seem not to include "guarantees and all such other expenses as may be reasonably estimated as essential to be incurred."

The provision in the contract in question authorizing the plaintiff to deduct from the amount due to the defendants an amount to be determined by the plaintiff for the purpose of capital expenditure and providing for the issuance of certificates of indebtedness to the defendants in such form and payable at such time or times and at such rate of interest as the plaintiff might from time to time determine for the moneys so deducted is *ultra vires*, since it constitutes in effect an enforced payment by the defendants to the plaintiff unrelated to the payment for services authorized in section 208 of the Membership Corporations Law. Said provision is also invalid, since there was no meeting of the minds upon the essential points of amount, duration and interest.

The provision of the contract that a deduction be made for a subscription to the Dairymen's League *News* is also unauthorized under the statute.

The defendants in this action are not estopped from raising the question of *ultra vires* as to the unexecuted part of the contract.

The provision in the contract that in case of neglect or default on the part of the defendants to perform the contract, the defendants would be liable to the plaintiff in the sum of ten dollars per cow for thirty cows and if such refusal or neglect continued for more than one month the defendants would be liable to an additional sum of three dollars per cow per month and that said amounts would be considered as liquidated damages and not as a penalty, must be construed as providing for a penalty and, therefore, unenforcible, since it appears that under this provision the defendants in this action would be liable for one thousand two hundred dollars, whereas, as a matter of fact, the expenses rightly chargeable against the defendants amounted to seventy-three dollars and three cents.

CLARK, J., dissents.

APPEAL by the defendants, Merle Holmes and another, from a judgment of the Supreme Court in favor of the plaintiff, entered

in the office of the clerk of the county of Oneida on the 31st day of January, 1923, upon the verdict of a jury, and also from an order entered in said clerk's office on the 30th day of January, 1923, denying said defendants' motion for a new trial made upon the minutes.

*W. R. Pratt* and *Edgar C. Emerson,* for the appellants.

*Bradley Fuller* [*P. C. J. DeAngelis* and *Seward A. Miller* of counsel], for the respondent.

SEARS, J.:

The plaintiff has recovered a judgment against the defendants for stipulated damages for the breach of a contract.   Upon this appeal the defendants attack this judgment on numerous grounds which naturally divide into two classes, one relating to the question whether any arrangement of any kind was ever made between the parties, and whether, if an agreement was made, there was a breach of any of the terms by the defendants, and the other relating to the validity and enforcibility of the terms embodied in the agreement upon which the action is founded.

These two classes will be considered in order.   The defendants were partners engaged in the business of dairying.   The plaintiff is a co-operative membership corporation organized under the provisions of article 13-A of the Membership Corporations Law (added by Laws of 1918, chap. 655, as amd.).   The instrument which is the foundation of the action provides for the marketing of defendants' milk and milk products through the agency of the plaintiff.   This instrument purports to have been signed on behalf of the defendants by one Frank Guernsey.   Guernsey's account of the execution of the contract is uncontradicted.   He testified that on September 28, 1920, he met the defendant George Holmes on the highway and had a conversation with him which evidently dealt with the plaintiff's enterprise for marketing dairy products for the producers.   In the course of this conversation the defendant George Holmes told Guernsey to " fix up " a contract for the defendants, and to sign it in their name.   Guernsey having an unsigned copy of the contract with him, signed it in the defendants' names in the presence of the defendant George Holmes.   The contract was in the same form used generally by this plaintiff. Attached to the instrument there were orders which Guernsey also signed on behalf of the defendants which were to be addressed to the persons to whom the defendants might deliver their milk (upon the plaintiff's order as provided in the contract) by which orders such persons receiving the milk were directed to make payment to the plaintiff for what they received from the defendants.   No

copy of the contract was delivered by Guernsey or any one else to the defendants. Subsequently, at a meeting of the members of the Afton Dairymen's League Co-operative Association, Incorporated, a different corporation from the plaintiff, the defendant Merle Holmes became a member and signed the by-laws of that organization, and the by-laws set forth that the members of that corporation were to sign contracts with the plaintiff in the form of the instrument which Guernsey had signed on the defendants' behalf. The details of the contract were set out in full in the by-laws. The defendants were at the time the contract was signed and until May 1, 1921, selling milk to the Clover Farms, Inc., and received pay for their milk from that institution. But, beginning May 1, 1921, although the defendants continued to deliver their milk to the Clover Farms, Inc., the plaintiff collected the amounts paid by that company for the milk delivered after May 1, 1921, by the defendants to the Clover Farms, Inc., by virtue of the direction contained in the order which had been attached to the agreement originally signed and which Guernsey had also signed for the defendants. Thereafter, beginning in June, 1921, and continuing until April, 1922, the plaintiff sent to the defendants monthly a check in payment for the milk received by the Clover Farms, Inc., from the defendants during the previous month. Attached to these checks were stubs signed by the Clover Farms, Inc., stating the amount that company had paid to the plaintiff " pursuant order given by you for milk delivered  *  *  * " during the previous month. The stub also contained figures showing how the amounts of the checks were arrived at. These computations are based upon clauses of the contract which are considered later in this opinion. This course of dealing continued until March 31, 1922, when the defendants ceased to deliver milk to the Clover Farms, Inc. It was at that time that the plaintiff terminated its arrangement to sell producers' milk to the Clover Farms, Inc., and previous to the first day of April notices were posted on behalf of plaintiff at various places in and about the territory where defendants lived, requiring producers having contracts with the plaintiff to deliver their milk, beginning May 1, 1922, to the plaintiff itself. Defendants delivered no milk to the plaintiff or on its order on April first, second and third. On April fourth the defendant George Holmes met two men by the name of Gregg and Russ, respectively, who were also producers under contract with the plaintiff, who called his attention to what they considered his contract obligation toward the plaintiff, and Gregg according to his testimony, which is not contradicted, read the contract which Guernsey had signed for defendants, or one like it, to Holmes,

including the penalty clause, which will be referred to later, and, after hearing it, Holmes said nothing but drove to the Afton station and delivered his milk that day to the plaintiff and continued to deliver it to the plaintiff at the Afton station for fourteen days in succession thereafter, at the end of which period the defendants stopped delivering milk to the plaintiff or upon its order and have delivered none since that time. About May first the witness Russ had a further conversation with George Holmes, after Holmes, as pointed out, had for some days ceased to deliver his milk to the plaintiff and Holmes said to Russ that he would keep on delivering or sending milk " right where he was." The court upon this evidence left it to the jury to say whether the contract signed on behalf of the defendants by Guernsey had been ratified by the defendants. Defendants have nothing to complain of in this ruling. Not only did they expressly authorize Guernsey to sign the contract (*Metzger v. Ætna Ins. Co.*, 227 N. Y. 411), but they received moneys in pursuance of the arrangement for almost a year and continued to deliver milk after the terms of the contract had been expressly called to their attention. Under the uncontradicted evidence the court would have been justified in ruling that the agreement, if valid in its terms, was binding upon both the plaintiff and defendants because, irrespective of signature, it was acted upon by both. (*Metzger v. Ætna Ins. Co., supra; Hyatt v. Clark*, 118 N. Y. 563; *Kilsby v. Nichols*, 180 App. Div. 827; *Trustees, etc., v. Bowman*, 136 N. Y. 521.) Nor can there be any doubt that the defendants violated the terms of the instrument providing they would sell all their milk or the manufactured products of milk which they sold (such as they retained for their own use or gave away being excepted) through the agency of the plaintiff, for the statement of Holmes that he would continue to deliver or send his milk where he was then sending it was an unequivocal statement that he was selling it elsewhere.

The other class of grounds of attack, based on the terms of the instrument, must, therefore, be considered. The points urged are four in number and relate to the instrument itself: *First*, that there was no consideration on the part of the plaintiff; *second*, that the provisions as to the plaintiff were *ultra vires* and in direct contravention of the terms of the statute authorizing and delimiting the relations between the parties to this action; *third*, that the provisions in relation to deductions were so indefinite as to vitiate the agreement in relation to distribution; *fourth*, that the clause for stipulated damages was in fact a provision for a penalty and unenforcible in law.

28

The general plan of the contract may be summarized thus:   The defendants constituted the plaintiff their exclusive sales agent for all their milk and manufactured products of milk, except such as the defendants might use or give away.   The proceeds of all sales of defendants' milk and milk products were to be received by the plaintiff.   The plaintiff was authorized to blend such proceeds of sales of the defendants' products into a common fund with the proceeds of sales of products of other dairymen having similar contracts, and, after making certain deductions, to pay the defendants from the net general fund an amount thereof in proportion to the quantity of their product to the entire amount of products sold through the plaintiff's agency without reference to the actual sales price of the particular product of the defendants, thus bringing it about that all producers operating through the plaintiff should fare alike no matter what differences there might be in the sales price in particular transactions.

The plaintiff expressly agreed to make distribution of the proceeds of sales in such way as to carry out the scheme.   Except, however, that the plaintiff covenanted that it would make distribution among the producers of the proceeds of all sales after making certain deductions, the plaintiff, in the entire instrument, made no express promise or agreement whatsoever.   To be sure, the contract recited that the agreement of the parties was in consideration of the outlays and expenses incurred and to be incurred by the association in providing means for handling, manufacturing and marketing the milk and dairy · products of the producer as therein mentioned.   As to the outlays already made, the recital, of course, relates to a past act which amounts to nothing as a consideration.   As to the future, there is not the slightest indication of what the outlays or expenses might be.   So far as this recital is concerned, there is no legal consideration on the defendants' part.   (*Alexander* v. *Equitable Life Assurance Society*, 233 N. Y. 300.)   Further, if no sales were made, there would be no proceeds to distribute, and the promises in relation to the distribution would not bind the plaintiff to do anything unless there can be read into the contract an agreement on the plaintiff's part to some action from which sales could reasonably be expected to accrue.   (*Schlegel Mfg. Co.* v. *Cooper's Glue Factory*, 231 N. Y. 459.)   A promise may be implied as well as expressed. Here we have a corporation organized for the sole purpose of assisting dairymen to market their products.   We have a contract that all products of the defendants to be sold were to be delivered to the plaintiff or its order and sold through its agency.   It can be said of this contract, paraphrasing the language of *Ehrenworth*

v. *Stuhmer & Co.* (229 N. Y. 210), that all of the circumstances which go to make up this contract are instinct with an obligation on plaintiff's part to receive or arrange for the receipt of all the milk and milk products of the defendants and use reasonable efforts to make sales of the milk and products covered by their agency at reasonable market prices. (*Wood* v. *Duff-Gordon,* 222 N. Y. 88; *Paige* v. *Faure,* 229 id. 114.) Such an implied covenant is sufficient as consideration. The argument then that the contract was wholly unilateral and without consideration must, therefore, be rejected.

The plan of distribution of the proceeds must be now examined. This subject is covered by the following clauses of the contract:

" 9. The proceeds of all sales made by the Association for the Producer shall be paid for by the purchaser or purchasers thereof to the Association, which proceeds, together with the proceeds of sales made by the Association for other producers, shall be blended into one general fund; the Association to make distribution thereof after making the deductions hereinafter stated, and pay over such funds to the Producer and to other producers in the same proportion that the quantities delivered by the several producers to the Association for sale shall bear to the whole, so that the price received by the Producer shall be uniform with that paid other producers, regardless of any variation or differences in the price received by the Association from such sale for the several producers, subject to such equitable differentials as said Association may from time to time establish. The Association shall deduct from the proceeds of such sales such uniform percentages as they charge others for like services and which the said Association may deem necessary to meet the expenses already incurred, together with such other sums as may be necessary to cover interest, overhead, depreciation, guarantees and all such other expenses as may be reasonably estimated as essential to be incurred by the Association in conducting its operations, for which no certificates are to be issued.

" 10. The said Association shall also make further deductions to create a special fund to retire loans; to be used in building warehouses or other necessary buildings; to purchase land and buildings; to secure necessary equipment; to provide such working capital as said Association may deem necessary; such deductions for the special fund to continue as long as the Producer delivers milk or milk products to the Association for sale. After the close of each fiscal year, each producer shall receive a certificate in such form and payable at such time or times and at such rate of interest as such Association may from time to time determine for all

**436** Dairymen's League Co-operative Assn., Inc., *v.* Holmes.

Fourth Department, January, 1924.                    [Vol. 207

moneys which he has contributed that year to the special fund from the percentages levied on his milk and dairy products, as herein provided.

" 11. The Producer agrees that said Association may also receive the proceeds of sales of other producers, and that said deductions as herein specified shall be uniform as to each producer, so that each producer will receive the same price per unit subject to such equitable differentials as may from time to time be established by the Association; distribution to be made by the Association which is hereby appointed by the Producer sole arbitrator of the distribution of said sums, and such distributions when so made shall be final and conclusive and binding upon the parties hereto. The Producer, in the absence of fraud, hereby waives all his rights in law or in equity to an accounting thereof, and this contract shall act as a bar thereto in any proceeding taken by the Producer therefor.

" 12. All of the aforesaid distributions as herein provided are to be distributed to the Producer on or before the 25th day of each and every month for approximately the amount realized from the milk and dairy products sold and paid for during the previous month, after the aforesaid deductions have been made; and as soon after the fiscal year as all of said milk and dairy products handled as aforesaid have been sold and pay received therefor, full settlement is to be made to the producers thereof."

These sections doubtless contemplated an equal distribution of the returns of sales among all the producers for whom the plaintiff should act as agent in proportion to the quantities delivered by the respective producers. Throughout the case the arrangement is spoken of as a " pooling " agreement, a term which well describes the system. But, before distribution was to occur, it must be noted that there were two classes of deductions to be made. The first class was to cover " interest, overhead, depreciation, guarantees and all such other expenses as may be reasonably estimated as essential to be incurred by the Association." These deductions were absolute and never to be paid to the producers. The other class was to create working capital and purchase plants, equipment and so forth, and these deductions were to be ultimately paid to the producers, but at such time or times and with interest at such rates as the association might determine. The association is a membership corporation. Its authority to do business is limited by the act of the Legislature under which it was incorporated. The defendants contend that they were non-members of the association, and this contention is not contested by the plaintiff, and, under the evidence, could not well be. We must, therefore, treat

the defendants as non-members. The following statutory provisions (Membership Corp. Law, §§ 199, 208, as added by Laws of 1918, chap. 655) are applicable.

Section 199 provides as follows: " A co-operative * * * dairy * * * association may be created under this article as a membership corporation for mutual help, not having capital stock or conducted for profit, for the purpose of acting as the agent for its members or any of them, performing for them services connected with the * * * manufacture, preservation, drying * * * storing, handling, utilization, marketing or sale of * * * dairy * * * products produced by them * * * or any one or more of the kinds of service specified in this section."

Under the terms of this section the dealings of such an association could only be on behalf of members. But section 208 provides as follows: " The association, as agent for a nonmember, may * * * sell his * * * dairy * * * products, but in no case· shall it charge a nonmember for such services more than the actual cost thereof, including the *pro rata* part of all overhead expenses. * * *."

The question is then sharply raised as to whether the contract between the parties is in violation of this provision. Our attention is not called to any other provision of law which authorizes this plaintiff to enter into such a contract. The statute gives the organization the status of a juridical person. But from this no implication of capacity to contract can be found in conflict with the statutory limitation quoted. It must, therefore, be determined whether under the contract the services rendered to the defendants are to be charged for at more than the actual cost of such services, including the *pro rata* part of all the plaintiff's overhead expenses (leaving out of consideration for the moment the deductions provided for).

The pooling arrangement contained in section 9 of the contract does not include any charge for services. While the individual producer might under it receive less or more than the amount of the proceeds of the sale of his particular products, the deficit would not be made up or the surplus paid from the funds of the association, but from the proceeds of sale of the products of other producers. In the present case, while the total amount paid by the Clover Farms, Inc., for the defendants' milk from May 1, 1921, to March 31, 1922, was $4,207.77, the amount which the plaintiff fixed as the basis of distribution for this milk was $3,329.45. This was the *pro rata* amount of the pooled fund applicable to the quantity of product furnished by the defendants. There is no contention that there is any inaccuracy in the figures, no suggestion

of fraud or irregularity. Other producers of milk must have received appreciably more than the proceeds of the sales of their particular product. But no profit from the arrangement or pay accrued to the plaintiff individually. The fund at all times belonged, not to the plaintiff, but to the producers, sales of whose product had gone to make it up.

The purpose of the plaintiff was to secure for dairymen the advantages of collective bargaining. The dealers, we may take judicial notice, were largely organized; and to secure a corresponding co-operation on the side of the producers, the Legislature saw fit to permit the organization of membership associations such as the plaintiff. A producer might well think that such an association economically and wisely conducted would work to his advantage, and that the pooling arrangement would result in a stabilization of return, and in the long run secure him a larger price by doing away with the variations in the market due to localized unfavorable conditions and the disadvantages of individual bargaining for the sale of a comparatively small amount of the product, the association having a large market extending over a wide spread of territory. Such an arrangement then may well be considered an incident to the service of marketing the producers' dairy products and within the terms of the authority given to the plaintiff by the Legislature.

The gross proceeds of the sales calculated at the pool price were, however, not to be distributed to the defendants; nor does the statute require them to be. A charge for the plaintiff's services was contemplated by the law and by the contract was to be deducted and retained by the plaintiff before payment was to be made to defendants. No charge including a profit could be made because the services by statute must be rendered at actual cost, but the cost could include the *pro rata* part of all plaintiff's overhead expenses. The deduction mentioned in section 9 of the contract was, doubtless, intended to be the service charge mentioned in the statute, but the draftsman of the contract was not satisfied with the statutory language but specifically includes " interest, overhead, depreciation, guarantees and all such other expenses as may be reasonably estimated as essential to be incurred." " Overhead " is a word of vague content. It is not a technical word of the law. It is a term which has recently been introduced in accounting. It may be said to include broadly the continuous expenses of a business irrespective of the outlay on particular contracts. Probably " depreciation " is properly included as overhead; " interest," possibly, but " guarantees and all such other expenses as may be reasonably estimated as essential to be

incurred " leaves a vague field of expenditure seemingly extending beyond the limits of the statutory authorization. If " guarantees," itself a word of doubtful meaning in this context, means general losses, such should fall on the members as provided in section 207 of the Membership Corporations Law (as added by Laws of 1918, chap. 655) and not be shared by the contracting non-members. The defendants do not appear to object to the actual deductions made under this clause, and we, therefore, pass to the consideration of the deductions specified in the 10th clause of the contract. Here the association reserves to itself the right to make further deductions, unlimited in amount, for the retirement of loans, the erection of structures, the purchase of real estate and equipment, and the provision of working capital. To be sure, these are to be treated as loans, but loans without period for repayment or assurance of fair interest. The plaintiff's will is the " sole " determining agency as to these vital elements and the determination of the plaintiff is not to be questioned. This clause cannot be sustained. If loans are enforced at less than the going rates of interest, the association is thus receiving a disguised payment for its services. Nowhere is it provided or implied that the interest is to be reasonable but it is provided expressly that it is to be at such rate as the association may from time to time determine. These loans are directly for the benefit of the association. The plants and warehouses constructed by the aid of these loans will belong to the plaintiff and a non-member can have no voice in their acquisition, use or operation. An enforced loan which does not have to be repaid at a definite time and without a definite amount of interest is an exaction constituting a payment to the association unrelated to the payment for services authorized in the statute. Here, clearly, the contract is *ultra vires*. In one other minor respect the contract provides for a deduction unauthorized by the statute and that is the deduction for a subscription to the Dairymen's League *News*. Nothing appears as to what this publication is; who publishes it or what connection it has with the expenses of sale of the defendants' milk or the association's overhead.

The plaintiff contends that the defendants are not in position to raise the question of *ultra vires;* that they have acted upon the contract, obtained its advantages and are estopped from questioning its validity. This is, doubtless, true as to so much of the contract as has been executed. As to the milk which has been delivered, payment must be made and received in accordance with its provisions whether they are within the statutory power of the corporation to make or not. But the contract was only

partially executed.   The agency was a continuing instrumentality for making sales, and the estoppel does not work against that part of the contract which is wholly unexecuted on both sides.   (*Oregon R. Co.* v. *Oregonian R. Co.*, 130 U. S. 1; 14a C. J. 318.)

The provision relating to the deductions for general business purposes for which certificates were to be issued is also invalid because there was no meeting of the minds upon the essential points of amount, duration and interest.   In *St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.* (235 N. Y. 30) the holding of the Court of Appeals was unfavorable to a contract where the sales price of paper after a definite period was to be mutually agreed upon. Here the contract is equally indefinite but leaves the decision on these vital elements to the uncontrolled volition of the plaintiff.   None of the cases cited by the respondent, such as *United States* v. *Mason & Hanger Co.* (260 U. S. 323), decided December 4, 1922, are applicable, as in these cases the parties agreed to leave to an arbitrator or expert the decision of a fact capable of determination by him, while here the whole question of plaintiff's business policy and defendants' participation in the business is left in the uncontrolled decision of the plaintiff.

One other point is urged by the defendants, namely, that the provisions of the contract in relation to what are called " stipulated liquidated damages," really constitute a penalty.   The clause in question is as follows:

" 2. The Producer covenants and agrees to and with the Association that if he at any time refuses or neglects to deliver such milk or the manufactured product thereof produced or manufactured by him to the Association, or upon its order, at such time and place as the Association may direct, then and in that event in every such case the Producer neglecting or refusing so to do will pay to the Association for such refusal or default, the sum of Ten Dollars ($10.00) per cow for 30 cows, and if such default or refusal shall continue for more than one month, an additional sum of Three Dollars ($3.00) for each cow per month, for the same number of cows, so long as such default or refusal continues, none of which payments are to be construed to be a penalty or forfeiture, but as stipulated liquidated damages as prescribed by Section 209-A of Chapter 655 of the Laws of 1918 of the State of New York,* and it is hereby agreed that the Association will suffer by reason of such refusal or default."

The contract is doubtless one where in the nature of things it is well nigh impossible to fix the actual damages which the plaintiff

* See Membership Corporations Law, § 209-a, as added by Laws of 1918, chap 655.— [REP.

suffered from the defendants' failure to carry on the contract and such a case is one where liquidated damages are particularly suitable. (*Tode* v. *Gross*, 127 N. Y. 480; *Hackenheimer* v. *Kurtzmann*, 235 id. 57.)

But the amount of liquidated damages must, as stated in section 209-a of the Membership Corporations Law (as added by Laws of 1918, chap. 655) in relation to contracts with members, be reasonable sums, in amounts fairly related to the actual damages ordinarily suffered in like circumstances. Inasmuch as the plaintiff under the statute could not charge non-members for its services more than the actual cost including overhead, it is apparent that practically the only damages which could be suffered by the breach of such a contract would be amounts based on the continued overhead charges, for the expenses of making sales of defendants' product would cease after the defendants refused to deliver the milk. It has been already stated that the total amount to be accounted for based upon the pool price for sales of defendants' product for eleven months was $3,329.45. While, according to the statements rendered by the plaintiff to the defendants, the pool expenses, which included overhead for the same period, amounted to $73.03, the stipulated damages under the contract for a breach continuing for that same period would have amounted to $1,200. It can hardly be said that such an amount has any fair relationship to damages which would ordinarily be suffered in like circumstances. The clause must be construed as providing for a penalty which is unenforcible. (*Seidlitz* v. *Auerbach*, 230 N. Y. 167; *Little* v. *Banks*, 85 id. 258.)

The judgment should be reversed on the law, with costs, and the plaintiff's complaint dismissed and judgment directed in favor of the defendants and against the plaintiff for $377.23, with interest on $251.09 thereof from the 1st day of April, 1922, and on $126.14 thereof from the 25th day of May, 1922, together with costs.

All concur, HUBBS, P. J., in result only, except CLARK, J., who dissents and votes for affirmance.

Judgment and order reversed on the law, with costs, complaint dismissed, and judgment directed in favor of the defendants and against the plaintiff on the counterclaim for $377.23 and interest, with costs.