EMILE C. DE STUBNER *v.* MICROID PROCESS, *et al.*

(CC 615)

Submitted October 24, 1939.  Decided December 16, 1939.

774

*Davis & Painter,* for plaintiff.
*Osman F. Swartz,* for defendants.

RILEY, JUDGE:

This certificate involves the sufficiency of a bill of complaint, filed in the Circuit Court of Kanawha County by plaintiff, Emile C. de Stubner, against Microid Process, Inc., a West Virginia corporation, United Carbon Company, Inc., a Maryland corporation, and United Carbon Company, a Delaware corporation, all having principal place of business in Charleston, West Virginia. The several demurrers to the bill were overruled.

The suit grows out of certain contractual relations between Emile C. de Stubner, the United Carbon Company, United Carbon Company, Inc., and Microid Process, Inc. For convenience the several corporations hereafter will be referred to as "United Carbon Company", "United, Inc.", and "Microid". By the suit, de Stubner seeks to recapture the use of certain patents, processes and inventions, the exclusive license to use and the exclusive right to sub-license same having been turned over to Microid, as he alleges, for exploitation.

The bill of complaint does not lend itself readily to the equity procedure in this State, which, of course, does not of itself render it insufficient on demurrer. Because of its unnecessary prolixity, its allegations will be set forth, in part, in narrative form.

In May, 1934, after a temporary option covering a few months, plaintiff and United Carbon Company entered into a writing, whereby the latter was given an option or right, for one year, to secure for its benefit the exclusive

license to use, with the exclusive right to sub-license, certain listed patents, inventions and processes, for the full term of any and all such letters patent, less five days; during the option period plaintiff was to demonstrate to the United Carbon Company, at the latter's expense, the practicability and commercial possibilities of the various processes and products thereof. This writing provided, among other things, that, in case the option should be exercised, a holding corporation, Vacuum Microid Process, Inc., would be formed, with an issued capitalization of 2,000 shares of first, and 2,000 shares of second preferred no par stock, carrying non-cumulative dividends of $6.00 per share; and 9,000 shares of no par common stock, and that the first preferred and 3,000 shares of the common stock, respectively, thereof, would be allocated to the plaintiff. The option was extended by written agreement until August 1, 1936. Before the expiration of the original option period, United, Inc., was formed for purpose of owning all the carbon black properties of the United Carbon Company, and became assignee of the latter's option. All the stock of the new company was owned by United Carbon Company. Prior to the expiration of the last period of extension, United, Inc., exercised the option, and on July 31, 1936, three contracts were made and executed: (1) plaintiff with United, Inc.; (2) plaintiff with Microid; and (3) Microid with United, Inc., in which plaintiff joined to indicate his approval.

During the option period and until August 28, 1936, plaintiff was in charge of the demonstration plant and had, so the bill alleges, demonstrated the practicability and commercial possibilities of the several processes and products thereof.

The written agreements of July 31, 1936, are too long to bear recital here. This case is here only on certificate, and the contents of the original agreements are well known to the parties thereto and their counsel. Only a meagre outline of these papers will suffice for the purposes of this opinion.

The agreement between plaintiff and United, Inc., recites the succession of that corporation to United Carbon Company's rights; the exercise of the option by United, Inc., subject to certain modifications; the organization of Microid with 9,000 shares of common stock, without par value, divided into "A" and "B" classes, in amounts of 3,000 and 6,000 shares, respectively; and the present ownership in Microid, by agreement of even date between plaintiff and Microid, of the exclusive license to use, with exclusive right to sub-license, plaintiff's inventions, as disclosed in patents and patent applications listed in the option of May 1, 1934. This agreement provides, among other things, that the first $12,000.00 of dividends shall be paid to the holder (de Stubner under his agreement with Microid) of Class "A" stock; that the expense of prosecuting plaintiff's patent applications shall be borne by Microid; that the board of directors by a majority vote shall determine the extent of expenditures; that so long as United, Inc., retains right to use the license of even date, from Microid to United, Inc., it shall advance funds, should Microid not have same available, to pay taxes, including those necessary to maintain the corporate existence of the corporation, and such expenses as Microid shall have incurred by its board of directors; said deficiency to be covered by notes of Microid; that this agreement and the license agreements of even date between plaintiff and Microid and Microid and United, Inc., are accepted as full and complete performance of the original option agreement, and in so far as there may be any difference, this agreement and those of even date shall prevail; that the agreement be spread upon corporate records of Microid and become a part of its records.

By the agreement between plaintiff and Microid, the former granted to the latter a "non-assignable * * * sole and exclusive license to use, together with the sole and exclusive right to sub-license the use of" a number of existing patents and inventions, and those to be subsequently developed or discovered, pertinent or valuable to the science and art of pigment dispersions, and Microid

agreed to defend such rights against infringement. The agreement further provided that in consideration of 3,000 shares of Microid stock delivered to plaintiff, the latter would be employed as director of technical research for a period of five years, at no salary, subject to his right to terminate such employment if annual dividends on Class "A" stock did not amount to $12,000.00, or unless someone (presumably United, Inc.,) made up the deficiency; that all patents produced as result of such research would inure to the benefit of Microid; that the license granted by such contract could be terminated (1) by adjudication of bankruptcy or insolvency of licensee; or (2) if dividends on "A" stock, plus such funds as may be paid the holder, did not equal the sum of $12,000.00; that termination under the latter required sixty days' notice; that upon termination for either cause, all licenses theretofore lawfully granted by Microid would remain in full force and effect, except that the royalties or license fees reserved to Microid under terms of each license granted should thereupon revert to and become the property of plaintiff; that all rights of Microid under said license would revert to and become the property of de Stubner, in event of termination of the agreement; and that licenses by Microid to others than United, Inc., were to be in accordance with the form attached to its license.

In the last of the three agreements, Microid granted United, Inc., an exclusive license to use and to sub-license others to use, any and all patents and inventions owned by Microid or under which Microid has a right to grant such license, for the treatment of carbon black or other pigments produced by the combustion or decomposition of hydrocarbon gases, petroleum or petroleum products and lamp black, under all the inventions and discoveries, whether patented or unpatented, relating to such use, and including the patents and inventions more particularly set forth in the schedule of patents, applications and inventions attached thereto. It also provided for cancellation in event of breach, default or failure to perform any of the terms and conditions thereof; made plaintiff

Microid's agent in event of conflict of interest between United, Inc., and Microid; and that upon the termination of the agreement with Microid, plaintiff was to receive one-third of the royalties.

In addition to the foregoing, the bill alleges that on or about August 28, 1936, the United Carbon Company and the United, Inc., at instance and direction of executive officers, and with acquiescence of Microid, but without that of plaintiff, took possession of the demonstration plant and has ever since had exclusive control and possession thereof for their own purposes, and nothing has been done by defendants, or any of them, under the agreements of July 31, 1936, with respect to exploitation and commercialization of plaintiff's processes in any field other than carbon black, in which the United Carbon Company and United, Inc., are solely interested; that defendants have failed to carry out and effect the promises, particularly those in regard to the commercialization of his processes; that when the representations were made prior to execution of agreements of July 31, 1936, defendants, especially United Carbon Company, never intended to perform and comply with said representations and promises, but by such false statements, known by them to be false, they obtained from plaintiff the exclusive license and the exclusive right to sub-license under plaintiff's patents; that it was well known and understood by all parties thereto at the time of the making of all of said agreements "that the exploitation of all this plaintiff's said processes in commercial fields * * * was the sole purpose and object of plaintiff in making agreements", and that plaintiff relied and acted on these representations; that had plaintiff known that defendants, especially United Carbon Company, would not do so, he would have refused to execute said agreements; that said promises were made for the purpose of convincing plaintiff of the truth thereof; that Microid has never, at any time, had any earned revenue, income or profit from any source, not even from the licenses granted United, Inc., and all moneys which may have come into possession of said Microid have been

loaned to it by said defendant, United Carbon Company, or its subsidiary, United, Inc.; that the only financial statement of Microid to which plaintiff has had access (March 31, 1938) showed that it owed on that date $107,200.71, which remains unpaid, together with other incurred indebtedness; that in December, 1938, defendants' attorney advised plaintiff's attorney that Microid owed debts aggregating $204,000.00; that for foregoing reasons, Microid is wholly unable to pay debts or any substantial part thereof in the usual course of business; that, as heretofore set out, in agreement between plaintiff and Microid, said license may be terminated by an adjudication of bankruptcy or insolvency; and that upon termination for either cause, all licenses theretofore lawfully granted by Microid shall remain in full force and effect, except that the royalties and fees reserved shall revert and become property of plaintiff.

The bill of complaint further alleges a failure of consideration, in that the shares of stock in Microid, received by plaintiff, are valueless.

The bill of complaint further alleges that although plaintiff's inventions, covered by patents and applications therefor, and the products thereof, were and are applicable to and cover the whole range of colored pigments, including black, nevertheless, Microid only granted the exclusive license to United, Inc., to use same in field of black pigments and non-exclusive license to Colloidal Pigment Company (now dissolved), also in field of black pigments; that Microid has not received any income or royalties from these licenses, nor has it attempted to fix royalties in accordance with said exclusive license; that Microid failed to exploit, develop, commercialize and demonstrate the inventions covered by patents and applications in the field of colored pigments; that there has been entire absence of effort in such direction; that although United Carbon Company or United, Inc., are attempting to practice and develop processes and have attempted to file patent applications covering such processes as pertain to black pigments, nevertheless, they have not fully and

promptly disclosed such inventions and processes or patent applications, nor assigned same to Microid, as required by said exclusive license from Microid, nor has Microid demanded such disclosure; that Microid has wholly refused, neglected and failed to commercialize, exploit and create a market for color pigments, and to provide laboratory facilities for additional research work, tests and commercial developments, to be carried out under direction of plaintiff, without salary, for five years, although plaintiff has been ready and willing at all times to perform such services as were expected from him, and has refrained from engaging in his profession; that United, Inc., with the acquiescence of Microid, has either directly or indirectly failed to legally, properly, and diligently protect patent rights of plaintiff in that disclosures have been made of pending patent applications, without first obtaining written statements necessary to protect the same; that Microid has wholly abandoned and thereby repudiated its agreement with plaintiff, in so far as the same relates to the field of colored pigments; that it has granted no license in the field of color pigments, and made no effort to do so; that no experiment or research has been made; that no attempt has been undertaken to commercialize or to use the inventions disclosed in plaintiff's patents; that notwithstanding dispersions of blue and white pigments appeared in market during 1937, and were called to Microid's attention, it wholly failed in its obligation to take any steps to protect the rights of plaintiff; that there are large and profitable fields in colored pigments, other than black, open to exploitation and commercialization in many varied lines of manufactured products, and which Microid never investigated. The bill further alleges that the two co-directors with plaintiff have told the latter that they are interested only in black pigments; that no directors' meetings, except one, have ever been held; that the president of Microid has failed and refused to call meetings of the stockholders; that said corporation has wholly failed to function as a going concern in the furtherance of any of the objects set forth in

its charter of incorporation; that by reason of said abandonment, plaintiff has incurred irreparable injury; that plaintiff is entitled to have the license and rights granted to Microid cancelled, and returned to him, subject to the terms of the reverter provision; that plaintiff now offers to return the Class "A" stock now held by him in Microid, upon the cancellation of the agreement and return to plaintiff of license and rights thereon and thereby granted.

No satisfactory appraisal of this bill of complaint can be had without a clear understanding of the contractual relations between the parties plaintiff and defendant. In this regard, circumstances leading up to the execution of the three agreements of July 31, 1936, are most important. Not until April, 1935, about the time the first extension agreement was executed, did the plaintiff learn for the first time that United Carbon Company had transferred its rights under the original agreement to United, Inc., a subsidiary corporation solely owned and controlled by it. Of course, the validity of that transfer can hardly be questioned now. Any objection plaintiff may have had to the transfer from the parent company to its subsidiary, United, Inc., was waived by him when he entered into the agreements of July 31, 1936. Only a casual reading of them brings this point into bold relief. The preamble of the agreement between plaintiff and United, Inc., recites expressly that the latter has succeeded to the rights of United Carbon Company, and that United, Inc., has elected to exercise the option under the agreement of May 1, 1934, subject to certain modifications; and this same agreement, in the body thereof, expressly refers to the agreement between Microid and United, Inc., whereby Microid transferred the exclusive license to United, Inc., in the field of black pigments. It also appears that plaintiff joined in the last-mentioned agreement and expressly assented thereto. Under the circumstances disclosed by the agreements themselves, plaintiff cannot complain now of the transfer of the option rights to United, Inc.

The original option agreement and three agreements of July 31, 1936, should be construed together. Clearly, they

indicate the parties thereto had in mind a common purpose, that is, the exploitation and commercialization of plaintiff's inventions. The right of Microid and United, Inc., to exploit is clear. Whether the agreements impose that duty is another question, because whatever the parties may have intended, they contain no express covenant or duty to exploit. Whether defendants, or any of them, are under an implied obligation to exploit will be discussed later on in this opinion. The intentions of the parties, as expressed in the agreements, are controlling. In this regard, consideration should be had of the original option agreement of May 1, 1934, providing for a period of demonstration pending the exercise of the option. Demonstration for what purpose? Evidently, for the purpose of ascertaining the practicability and commercial qualities of plaintiff's inventions. It contemplated the formation of a corporation known as Vacuum Microid Process, Inc.; it provided that plaintiff receive $150.00 per week during the period of demonstration and 2,000 shares of the first preferred, and 3,000 shares of the common stock of the proposed corporation; and, further, in an attached form of tripartite agreement, to be executed upon the exercise of the option, that royalties be paid on a scale to be determined at a future time. Thence, after the period of demonstration and the exercise of the option, plaintiff's only hope of substantial compensation was by royalties and dividends from the stock, but if his inventions were not exploited, the proposed company could not earn money and no dividends could be paid. Thus, if exploitation was not intended and required by this agreement, plaintiff, in the event of the exercise of the option by United Carbon Company, would have been, at the will and caprice of the United Carbon Company, in the most undesirable position of having his patents, which the bill alleges were the result of twenty-five years of endeavor in the pigment field, retained by that company during the lives thereof, less five days, without the assurance of any substantial compensation whatsoever. But the option was not exercised by the United Carbon Company. On the

contrary, that company, having the right either to exercise the option or not, transferred its rights to United, Inc., whose stock it owns and controls. Then and there plaintiff, if he wished to have his inventions exploited, had no other choice but to submit to the exercise of the option by United, Inc., which he did when he entered into the three contracts of July, 1936. True, these later agreements were substituted for the original agreement; nevertheless, the latter shows the intention of the parties to deal with all of plaintiff's inventions without regard to the separation of the exploitation thereof into two fields, and this intention, from the allegations of the bill of complaint and the provisions of the agreements themselves, continued through the course of the several extensions of the original agreement and into the exercise of the option by United, Inc., and the execution of the later agreements.

With this background in mind, let us study the three agreements sought to be rescinded in this suit, for the purpose of ascertaining the rights and duties of the parties thereunder.

The agreement between plaintiff and United, Inc., set up the corporate structure of Microid; allocated to plaintiff all of the Class A common stock, consisting of 3,000 shares, and the remaining 6,000 shares of common stock, denominated Class B stock, to United, Inc.; and provided, among other things, that plaintiff should select one member of the board of directors and United, Inc., the remaining two; and that so long as United, Inc., should elect to use its license as to black pigments, it should advance funds to pay Microid's taxes, corporate and otherwise, and such expenses as the board of directors should incur. Thus this agreement, by express provisions, tied the other two agreements into it. The agreement between the plaintiff and Microid actually transferred to the latter the license and the right to sub-license as to all of plaintiff's inventions, without regard to any severance between the fields of black and color pigments; and the agreement between Microid and United, Inc., in which plaintiff joined and gave his consent thereto, transferred to United, Inc.,

the license to use plaintiff's inventions solely in the field of black pigments. Whatever right the latter had in the field of black pigments to plaintiff's inventions, those rights necessarily came through Microid, the original licensee. So, the three agreements, sought to be rescinded, as disclosed by the bill of complaint and exhibits, interlock one with the other; they evidence a common purpose or enterprise; and the rights of United, Inc., are so clearly derivative from the plaintiff through Microid that, with the failure of the latter's rights, on any ground other than the adjudication of Microid's insolvency or bankruptcy, United, Inc.'s, rights also would fall. It follows that, unless we disregard the evident intention of the parties, this is not a case of severable or independent covenants. A dependent covenant is one which goes to the whole consideration of the contract, and gives right to rescind. 1 Black, Rescission & Cancellation (2d Ed.), sec. 212, note 286. Under the circumstances, if the agreements gave rise to an implied obligation for the exploitation of plaintiff's inventions, they extend to both fields, color and black pigments, and the sub-license from Microid to United, Inc., is equally as vulnerable under the allegations of the bill of complaint as the license from plaintiff to Microid.

Defendants' counsel admits that plaintiff would be entitled to rescission if the obligation to exploit were expressed in the agreements and if the breach thereof were complete, resulting in a total failure of consideration. But none of the agreements, as counsel suggests, contains an express covenant to exploit. *Dixie Cotton Picker Company* v. *Bullock,* 188 Fed. 921, is cited to the effect that rescission of a patent license will not be granted for failure to practice where the license agreement does not contain a provision expressly obligating the licensee so to do. This authority, though persuasive, is not binding on this Court. The contract between Microid and United, Inc., recites it was made in the State of New York and provides construction thereof under the laws of New York. The bill of complaint alleges that all three of the contracts were executed in West Virginia, although the agree-

ments between plaintiff and United, Inc., and Microid and United, Inc., do not recite where they were executed. Microid, as heretofore indicated, is a West Virginia corporation, and its performance evidently was ·to emanate, in the first instance, from its West Virginia office, since the bill of complaint discloses that it maintains its principal office in this State. It follows that if our view of the law governing the immediate question under discussion coincides with that held by the New York courts, no question of conflict of laws arises here.

The license of all of plaintiff's inventions for use in both black and color fields of endeavor is exclusive. This has an important bearing on the solution of this case. Where a patent license is non-exclusive, it is quite reasonable that patentee licensed in an effort to find among several licensees, one or more avenues for the commercialization, or development, of his inventions. But, where the license is exclusive, the patentee loses all control of his inventions, and it can be safely said that, in such case, the parties to the agreement did not intend that such result should follow from the license agreement, without assurance of a reasonable effort to exploit the patents thereunder. In *Wood* v. *Lucy, Lady Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214, the Appellate Division of the Supreme Court of New York (first judicial department), held that where a defendant, a "creator of fashions", gave plaintiff the *exclusive* right, subject to her approval, to endorse the designs of others, on a division of profits arising from sale, there was an implied promise to use reasonable efforts to bring profits into existence. Mr. Justice Cardozo, late of the Supreme Court of the United States, then a member of the Appellate Division of the New York Court, in the opinion, said: "We think * * * a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation', imperfectly expressed. * * * if that is so, there is a contract. * * * The

defendant gave an *exclusive* privilege. She was to have no right for at least a year to place her own endorsements or market her own designs, except through the agency of the plaintiff. The acceptance of the exclusive agency was an assumption of its duties." The analogy of this case, though not involving a patent license, to the instant case is striking indeed. Here, the instant contracts gave to Microid the exclusive license and right to sub-license to United, Inc., through Microid to United, Inc., as to black pigments. See *Neenan* v. *Otis Elevator Company*, 180 Fed. 997, 999, to the effect that a clause in an assignment of patents relating to elevators, in which assignee agreed to pay a royalty on each elevator, which provided that assignee "shall guarantee that the royalty upon elevators erected and constructed by it * * * shall amount to not less than three thousand dollars", while not obligating assignee to construct elevators in such quantities, required it nevertheless to use *bona fide* efforts to exploit assignor's invention. In *Corbet* v. *Manhattan Brass Company*, 93 App. Div. 217, 87 N. Y. S. 577, 183 N. Y. 548, 76 N. E. 1092, the court held that, under an assignment of a patent, whereby assignee agreed to manufacture and sell lamps on a royalty basis which should not in any year net the inventor less than $500.00, assignee, notwithstanding the minimum royalty provision, could not refrain from such manufacture and sale. In *Driver-Harris Co.* v. *Industrial Furnace Corporation*, 12 Fed. Supp. 918, 919, the court (Western District of New York), in granting the right to sue a receiver under an alleged patent assignment, held that the assignment gave rise to an implied warranty that the patent will be worked to earn stipulated royalties. To the effect that an exclusive agency to sell gives rise to the implied covenant of agent to make *bona fide* efforts to effect sales, see *Alida Oil Burner Sales Corporation* v. *Berggern & Anderson Mach. Co., Inc.*, 251 App. Div. 745, 296 N. Y. Supp. 88; *Mueller, Admx., etc.* v. *Bethesda Mineral Spring Co.*, 88 Mich. 390, 50 N. W. 319; *Taylor Company* v. *Bannerman*, 120 Wis. 189, 97 N. W. 918; *Phoenix Hermetic Co.* v. *Filtrine Manufacturing Co.*, 164

App. Div. 424, 150 N. Y. S. 193; *Dairymen's League Co-Op. Ass'n.* v. *Holmes,* 207 App. Div. 429, 202 N. Y. Supp. 663. See also, *Weiner* v. *Pictorial Paper Package Corp.* (Mass.), 20 N. E. (2d) 458, decided under the laws of the State of New York.

Defendants' counsel stresses plaintiff's failure to allege whether or not he has received the $12,000.00 yearly as stipulated in the agreements. However, plaintiff is entitled to a *bona fide* effort to have his inventions exploited, and he is not bound to accept such payments in lieu thereof, in the absence of a showing that the exploitation of his inventions would earn him profits in a yearly amount less than the stipulated sum. *Corbet* v. *Manhattan Brass Co., supra; Neenan* v. *Otis Elevator Company, supra; Genet* v. *Press., etc., of Delaware & H. Canal Co.,* 136 N. Y. 593, 611, 32 N. E. 1078, 19 L. R. A. 127.

For the foregoing reasons, the duty to exploit plaintiff's inventions, in the instant case, is implied, and because the implied covenants in the several contracts are dependent, this duty runs through the entire field of both black and color pigments.

The question then arises whether the bill of complaint on the question of exploitation contains such allegations as will ground equitable relief. In the first place, fraud is alleged in two particulars: (1) that United Carbon Company and United, Inc., falsely represented that they had adequate technical staffs and trained organizations, which could be used to exploit plaintiff's inventions in both fields of endeavor; and (2) that these two defendants, in the negotiations leading up to and contained in the original contract of May 1, 1934, and the subsequent agreements of July 31, 1936, represented to plaintiff that his inventions would be exploited, though said defendants, when said representations were made, never intended to exploit in the field of color pigments. The first ground of fraud does not afford equitable relief. Matters of opinion are not basically fraudulent. *McCormick* v. *Jordan,* 65 W. Va. 86, 63 S. E. 778; *Jones* v. *McComas,* 92 W. Va. 596, 115 S. E. 456, 459; *Kimmel* v. *Eastern Coal, etc., Co,.* 97 W. Va.

154, 158, 124 S. E. 661; *Osborne* v. *Holt,* 92 W. Va. 410, 114 S. E. 801. For exception to the rule, not applicable to instant case, see *Poole* v. *Camden,* 79 W. Va. 310, 92 S. E. 454, L. R. A. 1917E, 988. The allegations of the bill in this regard simply express plaintiff's opinion as to the efficiency of the organizations of the two carbon companies. Reasonable men may differ in their opinions on that question.

The second ground of fraud, based as it is upon the alleged representations that the defendant carbon companies intended to exploit plaintiff's inventions, is tenable in a restricted sense only. That they are promissory in their nature is undeniable, and promises, of themselves, do not constitute fraud. 1 Black, Rescission and Cancellation (2d Ed.), sec. 89. Where, however, as in the instant bill, plaintiff alleges that the promises were made with the then present fraudulent intent that defendants would not perform them, there is such fraud as would ground equitable relief, though the difficulty of proving such intent is very apparent. *Gall* v. *Cowell,* 118 W. Va. 263, 190 S. E. 130; 1 Black, Rescission and Cancellation (2d Ed.), sec. 90, and numerous cases cited, and note 378.

The bill of complaint, however, exhibits another and more satisfactory ground of relief, based upon the alleged breach of the implied covenant to exploit, notwithstanding there is a clear distinction between rescission and breach of contract. 1 Black, Rescission and Cancellation (2d Ed.), p. 5. Generally, a breach of contract gives rise simply to an action at law for damages; and where a plaintiff has an adequate remedy at law, of course, resort cannot be had to a court of equity. Though some authorities seem to regard rescission in patent cases as being in the realm of substantive law, to so hold in the instant case contravenes the equity practice and procedure of this state. If plaintiff here has a valid right without an adequate legal remedy, he is entitled, of course, under our practice, to resort to a court of equity. If it is true, as alleged in the bill of complaint that the defendants breached the implied warranty to exploit the inventions both as to black and color pigments, what relief could this plaintiff obtain

at the hands of a court of law? Simply damages at most; but the right to damages, without a yardstick with which to measure them, furnishes no adequate remedy. If the agreement to exploit in both fields of pigments has been breached, it is difficult to ascertain how plaintiff's loss of profits can be determined. That determination lies only in practical demonstration by actual exploitation, and because courts of law and equity cannot be converted into laboratories or experiment stations, the only available remedy lies perhaps in specific performance, and certainly, as sought here, in rescission. And as to the latter we so hold.

An additional ground upon which plaintiff seeks relief is the insolvency of Microid. The agreement between plaintiff and that corporation provided for the right of rescission in the event of the adjudication of Microid's bankruptcy or insolvency; and because equity does not favor a circuity of actions, the adjudication of insolvency, if warranted by the facts, may be made in the instant suit. On this question the bill alleges that Microid has no assets except plaintiff's inventions; that it is indebted to United, Inc., in an amount of over $107,000.00; that on one occasion, counsel for all of the defendants admitted to plaintiff's counsel that Microid's total indebtedness amounted to $204,000.00; that Microid was without any revenues with which to pay its indebtedness. Defendants' counsel, however, counters that plaintiff himself alleges that his inventions are valuable. True, plaintiff alleges that he regards his inventions valuable, but necessarily their value, if real, lies only in exploitation and not the withholding of the same until plaintiff's patents have expired by lapse of time. Relief, solely on the ground of Microid's insolvency, is restricted to Microid alone; because the agreement between plaintiff and that corporation expressly provides that upon its termination upon adjudication of bankruptcy or insolvency "all licenses * * * shall remain in full force and effect except that royalties or license fees reserved to Microid under the terms of each license granted by it" shall become plaintiff's prop-

erty and such licensee shall thereafter deal with plaintiff as if the license agreements had been made directly with plaintiff as licensor. This agreement further provides that all rights of Microid, in the event of termination on the ground of bankruptcy or insolvency, shall revert to plaintiff. Thus, plaintiff has precluded himself thereby from any cancellation of the sub-license to United, Inc., in the event Microid's insolvency is the only ground of rescission.

Relief is further sought on the ground that the agreement from plaintiff to Microid is invalid for failure of consideration, in that the shares of stock of Microid which plaintiff received on July 31, 1936, were worthless at the time received, and have ever since been worthless. These shares of stock were undoubtedly speculative. The very nature of the transaction *ex necessitate* made these shares of stock speculative, and speculation which would continue until the successful exploitation of plaintiff's inventions. One who buys a speculative security for more than it is worth cannot predicate rescission based upon a situation which he well knew at the time he undertook the risk.

The ruling of the chancellor in overruling the several demurrers of the defendants is affirmed.

*Ruling affirmed.*